**Lynne ALBER, Herman Alber, Amy Alber, Ron Alber, Cameron Alber and Joshua Alber, Plaintiffs,**

v.

**ILLINOIS DEPARTMENT OF MENTAL HEALTH AND DEVELOPMENTAL DISABILITIES, William Murphy, Glenn J. Grzonka, Reginald Richardson, Ralph Travis, Protection & Advocacy, Inc., Zena Naiditch, Michael Richardson, National Heritage, Inc., Charles A. Osborn, Jr., Herlinda Martinez Monaco, National Heritage Realty, Inc. and Mary Ann Guttman, Defendants.**

No. 90 C 6576.

United States District Court, N.D. Illinois, E.D.

March 3, 1992.

Roger Derstine, Chicago, Ill., for Alber, et al., plaintiffs.

Richard F. Linden, Asst. Atty. Gen., Chicago, Ill., for Department defendants.

J. Kent Mathewson, Gerald L. Maatman, Jr., Maureen McGinnis, Baker & McKenzie, Chicago, Ill., for P & A defendants.

Nicholas Lynn, Daniel R. Gregus, William A. Buzogany, Kristopher S. Heston, Holleb & Coff, Chicago, Ill., for NHI defendants and NHRI defendants.

## MEMORANDUM OPINION AND ORDER

SHADUR, District Judge.

This case raises challenging questions about the rights of a non-biological "family" to claim rights of family association under the United States Constitution. After this Court assumed responsibility for the case by random reassignment last November upon the retirement of its former colleague Honorable Nicholas Bua, its ex-

amination of the court file revealed four fully-briefed motions to dismiss. For the reasons stated in this memorandum opinion and order:

1. the motion of defendants Protection & Advocacy, Inc. and Michael Richardson is granted in part and denied in part;

2. the motion of defendant Zena Naiditch is granted in part and denied in part;

3. the motion of defendants National Heritage, Inc. and Charles Osborn, Jr. is granted; and

4. the motion of defendant National Heritage Realty, Inc. is granted in part and denied in part.

## PROCEDURAL BACKGROUND: LOSS OF JURISDICTION?

This action began on June 29, 1990 when Lynne Alber, Herman Alber, Amy Alber, Ron Alber, Cameron Alber and Joshua Alber (collectively "Albers," while each is referred to individually by his or her first name) sued a variety of defendants in the Circuit Court of Cook County, Illinois. Albers claimed that various acts of the defendants violated their federal constitutional rights as protected by 42 U.S.C. § 1983 ("Section 1983"). They also asserted many violations of state law.

On November 1, 1990 defendants removed the case to this District Court pursuant to 28 U.S.C. § 1441(b),[1] which permits the removal of "[a]ny civil case of which the district courts have original jurisdiction founded on a claim or right arising under the Constitution...." Original district court jurisdiction existed because by definition a Section 1983 claim invokes a constitutional "claim or right." Removal of the state-law claims as well was permissible under the doctrine of pendent jurisdiction because those claims arose out of a

"common nucleus of operative fact" (*United Mine Workers v. Gibbs*, 383 U.S. 715, 725, 86 S.Ct. 1130, 1138, 16 L.Ed.2d 218 (1966)), judicial economy is promoted by a single resolution of all the claims, and there appears to be no possibility of prejudice to any party from the exercise of federal jurisdiction over the state claims.[2]

Yet on November 28, 1990 Judge Bua remanded the case to state court via a minute order that did not explain the legal basis for the remand. This District Court's records do not reflect that a certified copy of the remand order was ever sent to the state court. On December 19 defendants filed a petition in the Court of Appeals seeking a writ of mandamus that would vacate Judge Bua's order. On January 2, 1991 (before the Court of Appeals had acted) Judge Bua issued a new minute order in which he vacated his first order and reasserted jurisdiction over the case. Consequently the Court of Appeals later dismissed the petition for mandamus as moot.

Judge Bua's second order represented a legal rarity—a district judge sua sponte reasserting jurisdiction over a case that in theory had departed to another court. Given this Court's independent obligation to ensure that federal jurisdiction is proper regardless of the route by which a case reaches its calendar, that second order bears brief scrutiny and discussion.

Orders of remand issued pursuant to Section 1447(c) are not reviewable or appealable, while orders of remand that purport to rest on some other legal basis—and that are hence wholly lacking in authority—may in fact be reviewed or appealed (*Thermtron Products, Inc. v. Hermansdorfer*, 423 U.S. 336, 346–52, 96 S.Ct. 584, 590–94, 46 L.Ed.2d 542 (1976)). In his second order Judge Bua explained that he had issued the first order because state courts

---

1. Further citations to Title 28's provisions will simply take the form "Section —." That usage should not create any confusion with the references to Section 1983, in light of the very different numbering of the Title 28 provisions involved here.

2. Though the judge-made doctrine of pendent jurisdiction has been replaced by the statutory

doctrine of "supplemental jurisdiction" (Section 1367), the new statute applies only to "civil actions commenced on or after [December 1, 1990]" (Pub.L. 101–650, Title III, § 310(c), Dec. 1, 1990, 104 Stat. 5113). This case was both filed in the state court and removed to this federal court before that date, so that pre-statutory pendent jurisdiction principles apply.

have concurrent jurisdiction over Section 1983 cases, a ground not specified as a basis for remand in Section 1447(c). Citing *Thermtron,* Judge Bua therefore deemed his first order as open to correction.

In cases where the remand order has relied on Section 1447(c), the district judge lacks any power whatever over a case once the remand order has been entered and a certified copy has been sent to the state court (*City of Valparaiso v. Iron Workers Local Union No. 395,* 118 F.R.D. 466, 468 (N.D.Ind.1987) cites a wealth of case law and treatise discussion confirming that total loss of jurisdiction). Once that copy is sent, there literally is no case left in the *federal court*—and thus any *order* that the district judge might enter in the case, even an order seeking to vacate the remand order, must be a nullity.[3]

It might be thought that same rule would apply to remand orders that do not rely on Section 1447(c)—after all, a case that's gone is gone, no matter what legal grounds the judge cites when showing it to the courthouse door—but our Court of Appeals has held otherwise. When a case is sought to be remanded on grounds not cited in Section 1447(c), so that appellate review is available to begin with, such appellate jurisdiction exists whether or not the certified copy has been sent to the state court because "the district court clearly intended its remand order to be a final disposition of the case" (*J.O. v. Alton Community Unit School Dist. 11,* 909 F.2d 267, 271 (7th Cir.1990)).

So far as the potential for appellate consideration is concerned, then, a case purportedly remanded on grounds outside Section 1447(c) has not left the federal court-

house until the appellate process has run its course. Although the corollary proposition of retained *district court* jurisdiction does not necessarily follow,[4] it seems appropriate to hold that so long as the case thus remains in the courthouse and nothing has caused the District Court to be ousted of jurisdiction in favor of the Court of Appeals,[5] the district judge retains the power to reconsider his or her own order of remand—indeed, in the case of a timely motion for reconsideration, has the obligation to decide the issue (*In re Shell Oil Co.,* 631 F.2d 1156, 1158 (5th Cir.1980) (per curiam)). Thus even if the clerk had sent a certified copy of Judge Bua's first order to the state court, his second order would have been proper. Jurisdiction exists here.

## STRUCTURE OF THE COMPLAINT

In March 1991 Albers filed a five-count Amended Complaint ("AC" or "Complaint," citations to which will take the form "¶ —") before Judge Bua, alleging that defendants had violated their rights under the United States Constitution, Illinois statutes and Illinois common law by twice removing Ron and Cameron from the Alber home without consent and then confining them in institutions that provided legally inadequate care instead. Albers have named 13 defendants in all, divided here for convenience into four groups:

1. Illinois Department of Mental Health and Developmental Disabilities, its director William Murphy and its employees Glenn Grzonka, Reginald Richardson and Ralph Travis (collectively "Department Defendants" and individually "Department," "Murphy," "Grzon-

---

3. That inability to erase mistakes made in remand orders once implemented is doubtless the reason for this District Court's General Rule 30(b), which delays the effect of such orders for 14 days unless the remanding judge expressly directs that the certified copy be mailed to the state court "forthwith."

4. After all, the figurative "leaving the courthouse" metaphor is only that—a metaphor. Most federal courthouses do not, like Chicago's Dirksen Building, house both the District Court and the Court of Appeals. It would be conceptually conceivable for a case to remain subject

to consideration by the latter but not the former.

5. It is unnecessary to rehearse, as our Court of Appeals has done on a number of occasions, the different meanings that may be ascribed to "jurisdiction" as it pertains to a District Court's power to act after a notice of appeal from a final or an interlocutory order has lifted the case to the Court of Appeals. In this instance the effort to undo Judge Bua's first order had taken the form of a mandamus petition, so that the metaphorical lifting had not taken place.

ka," "Reginald Richardson"[6] and "Travis") are named in a variety of counts. Murphy is named in Counts III, IV and V in his official capacity only (¶ 18). Grzonka is also named in those three counts, in both his individual and official capacities (¶ 19). Reginald Richardson is named in Counts III and IV, in both his individual and official capacities (¶ 20). Travis is named in Count IV, in his individual and official capacities (¶ 21). Department Defendants have filed a joint Answer and an accompanying statement of affirmative defenses, but no motions to dismiss.

2. Protection & Advocacy, Inc., its director Zena Naiditch and its employee Michael Richardson (collectively "P & A Defendants" and individually "P & A," "Naiditch" and "Michael Richardson") are named in Counts I through IV. P & A is sued in its official and corporate capacity (¶ 22), while Naiditch and Michael Richardson are sued in their individual and official capacities (¶¶ 23–24). P & A and Michael Richardson have filed a joint Answer as well as a motion to dismiss Counts I through IV for failure to state a claim. Naiditch has filed only a motion to dismiss, also applicable to Counts I through IV.

3. National Heritage, Inc. ("NHI"), its former chairman Charles A. Osborn, Jr. ("Osborn") and its alleged employee Herlinda Martinez Monaco ("Martinez Monaco") are named in Count II. NHI is sued in its corporate capacity (¶ 25). Osborn is sued in his official and individual capacities (¶ 26). Martinez Monaco is sued in her individual capacity (¶ 27). NHI and Osborn have filed a motion to dismiss Count II, the only count in which they are named. Martinez Monaco has filed nothing at all.

4. National Heritage Realty, Inc. ("NHRI") and its employee Mary Ann Guttmann ("Guttmann") were added to Count II by the Amended Complaint.[7] NHRI is sued in its corporate capacity (¶ 27) and Guttmann in her individual capacity (¶ 30). NHRI has filed a motion to dismiss Count II. Guttmann has filed nothing at all.

COMPLAINT ALLEGATIONS [8]

All six of the Albers live together on a family farm in Morrison, Illinois. Lynne and Herman are a married couple (¶¶ 4–5). Amy is their natural minor child (¶ 6), and Joshua is an adult with cerebral palsy whom the Albers adopted in 1980 when he was about 11 years old (¶ 14). Cameron and Ron are adults afflicted with Down's Syndrome (¶ 7)—Lynne and Herman adopted them in 1989 (¶ 11), after the events of this case had run their course. Ron and Cameron are not biologically related.[9]

In the early 1970s Lynne and Herman became interested in taking disabled children into their home. Toward that end they visited the Dixon Developmental Center, a residential facility run by Department for children and adults with developmental disabilities (¶¶ 31–33). Dixon is about 25 miles from the Alber family farm (¶ 4).

**6.** To make sure that Michael Richardson is not confused with Reginald Richardson, this opinion always refers to each by his full name.

**7.** That pleading also named Robert J. Galecke, President of NHRI. Judge Bua dismissed Galecke as a defendant for lack of jurisdiction via minute order dated October 16, 1991. Albers have not substituted another defendant in Galecke's place.

**8.** Rule 12(b)(6) principles require this Court to accept as true all of the Complaint's well-pleaded factual allegations, drawing all reasonable inferences in Albers' favor (*Nelson v. Monroe Regional Medical Center,* 925 F.2d 1555, 1558–59 (7th Cir.1991)). For the most part this opinion has followed Rule 12(b)(6) principles in assem-

bling the factual statement that follows and in applying the law to the facts. Not all the motions now pending fall under the rubric of Rule 12(b)(6), however, and where appropriate this opinion has made different assumptions or judgments as required by the legal framework of those other motions.

**9.** During 1988, when the events underlying this case unfolded, Ron and Cameron apparently went by the last names of their natural parents: Reichard and Franklin respectively (Albers Mem. in Response to NHI Motion To Dismiss, Ex. A). Alber became their legal last name when Lynne and Herman adopted them in 1989.

After extensive interviews, medical tests and home inspections, Department approved Lynne and Herman as caregivers.[10] During 1974 and 1975 Department sent three children from the Dixon center to live with the Albers: seven-year-old Ron, seven-year-old Cameron and six-year-old Joshua. Department sent a fourth handicapped child, Tracy Zang ("Tracy"), to live with Lynne and Herman at some time not specified in the Complaint (¶¶ 31–46).[11]

Ron and Cameron have been diagnosed as either profoundly or severely retarded (¶ 53). "Profound" refers to an I.Q. level under 20, "severe" to a level between 20 and 34 (see *In re Grady*, 170 N.J.Super. 98, 405 A.2d 851, 855 (1979), describing degrees of retardation). Neither Ron nor Cameron has ever been able to make meaningful choices about his own care, treatment or custody (¶ 54). Both are "developmentally disabled" under Illinois law: They suffer from retardation or comparable disabilities that originated before the age of 18, are expected to continue indefinitely and constitute a substantial handicap (Ill.Rev. Stat. ch. 91–½, ¶ 1–106).

For over 13 years, until the events that triggered this lawsuit, Ron and Cameron lived with Lynne and Herman in apparent peace. Lynne and Herman provided them (as well as Joshua and Tracy) with food, clothing, shelter and personal care and arranged for appropriate medical care, dental care and education. Those expenses came at least partly out of Lynne's and Herman's own pockets—it is unknown whether Department or anybody else helped defray Albers' expenses (¶¶ 49–52).

In 1980 Lynne and Herman adopted Joshua (¶ 14).[12] In 1983 they became the legal guardians of Ron and Cameron (¶ 48), though the Complaint does not specify the statutory basis of the guardianship. That guardianship lapsed as a matter of law when each of Ron and Cameron turned 18, in 1985 and 1986 respectively. Ron and Cameron continued to live with Lynne and Herman as though nothing had changed.

This case has its genesis in the events of 1988.[13] At the time Ron was about 21 years old and Cameron about 20. Both were enrolled at Union Grove School, where they attended special education classes taught by Donna Addleman ("Addleman"). In January Lynne learned that Addleman made her students stand outside in subfreezing temperatures, claiming that the practice would improve the image of handicapped students with the rest of the school and would encourage the students to complete their work more effectively. Lynne complained to the school board. Addleman resigned before the board could consider the complaint formally, but the board permitted her to stay on until the end of the academic year. School authorities later ordered an end to the bizarre practice (¶¶ 55–60).

Addleman therefore remained at Union Grove as a lame-duck teacher. On March 29 a teacher's aide assigned to Addleman telephoned P & A to report that Lynne and Herman were neglecting Ron and Tracy (apparently the allegation did not encompass Cameron). Illinois law provides that the governor may designate a nonprofit agency to protect and advocate the rights of the developmentally disabled (Ill.Rev. Stat. ch. 91–½, ¶ 1151), and P & A is the agency so designated.

On April 14 P & A staff member Michael Richardson briefly visited the Alber home

---

**10.** "Caregivers" is a vague and rather awkward term, to be sure. But the Complaint says nothing about the legal basis of the 1974 and 1975 placements, so this Court has no way of knowing what more precise term applies.

**11.** Tracy lived with Lynne and Herman until 1988 and was removed from their home at the same time and in the same way as Ron and Cameron. But unlike Ron and Cameron, for unknown reasons Tracy has not returned to the Alber home (¶ 103) and is not a party to this action.

**12.** There is a small inconsistency in the Complaint, which states first that Joshua was adopted in 1980 (¶ 14) and then that Lynne and Herman became his legal guardians in 1983 (¶ 48). This opinion assumes that the first allegation is correct, although nothing of significance depends on the point.

**13.** All dates in the next several paragraphs refer to occurrences during 1988. Year designations are therefore omitted.

to investigate the complaint.[14] He spoke with Lynne, observed the young people and left. No further action by P & A followed until April 20, when the agency received a second allegation against Lynne and Herman from a staff person at Union Grove. On April 22 Michael Richardson met with Addleman at the school to discuss the allegations. From the school he went directly to the Alber home, where Herman refused to talk to him. Michael Richardson told Herman that the situation "looked very bad." Then he departed (¶¶ 66–71).

That was the last contact between the family and P & A until April 28, when Michael Richardson returned to the school. There, with Addleman's assistance, he tried to communicate with Ron, Cameron and Tracy. Together Addleman and Michael Richardson prompted each of the three into making some sort of positive response to the suggestion that they move out of the Alber home. Cameron responded in sign language, while Ron and Tracy responded orally. Michael Richardson then went to the director of the special education program and demanded that the three students be released to his custody. When the director balked, Michael Richardson threatened to call the sheriff and to charge the school with "unlawful restraint." In response to that threat the director permitted him to take Ron, Cameron and Tracy (¶¶ 73–82).

Michael Richardson took the three to Village Inn Nursing Home ("Village Inn"), a state-licensed privately-administered residential facility for the developmentally disabled. NHI Defendants or NHRI are responsible for the management of the home.[15] Village Inn's staff people admitted the three young people without benefit of any diagnostic evaluations. Each of the three signed a contract of admission with his or her "mark." On admission they were observed to be frightened, apprehensive and hungry, and during their first night they were restless and cried often.

No staff member at Village Inn ever filed a petition for guardianship of any of the three, nor was any individual programming provided for them during their stay (¶¶ 87–95).

Cameron's natural parents then filed a guardianship petition in the Circuit Court of Whiteside County. On June 28 that court named Cameron's natural parents as his legal guardians. Later that same day Cameron's natural parents removed him from Village Inn and returned him to Lynne and Herman. On July 15, in response to another guardianship petition, the same court appointed Lynne and Herman as Ron's legal guardians. Lynne and Herman brought Ron home from Village Inn the same day (¶¶ 97–102). Tracy remained at Village Inn and remains there today (¶ 103).

Michael Richardson promptly began to try to remove Ron and Cameron from the Alber home again. He filed three different complaints: one with the Illinois Department of Public Health ("DPH"), a second with the Whiteside County State's Attorney and a third with Department's Bureau of Certification and Licensure ("Bureau"). All three complaints alleged that Lynne and Herman were operating an unlicensed communal care facility (¶¶ 104–09).

Two of those complaints died quickly. DPH investigators visited the Alber home and rejected Michael Richardson's complaint as invalid (¶ 107). After a hearing the Circuit Court denied a motion by the State's Attorney seeking a temporary injunction against the Albers, and no permanent injunction was ever sought thereafter (¶¶ 110–14).

Department did act against Lynne and Herman. Following a home visit by Bureau staff, on August 31 Bureau director Grzonka issued an order of closure directed against Lynne Alber. Two days later Department employee Reginald Richardson arrived at the Alber home and took custody of Ron and Cameron (¶¶ 115–17). He

---

**14.** For purposes of this opinion, Michael Richardson is assumed to have been acting at all times on behalf of P & A and at the direction of Naiditch.

**15.** This opinion deals later with which of those alternatives is true for purposes of possible Section 1983 liability.

brought them to Lincoln Developmental Center ("Lincoln"), a residential facility run by Department. They were admitted to Lincoln without benefit of any diagnostic evaluations, and the physician who examined them upon admission found them well-nourished (¶¶ 119–21).

Lincoln's director Travis wrote the Albers to advise them of the admissions. Lynne, along with Cameron's natural parents, demanded that Department release Ron and Cameron. Department eventually complied. Ron was released to Lynne after 46 days at Lincoln, and Cameron was released to his natural parents after 60 days. Cameron's parents then returned him to the Alber home, where he and Ron have lived ever since (¶¶ 122–27, 129). Lynne and Herman became Cameron's legal guardians in March 1989 (¶ 10). They have since adopted both Ron and Cameron (¶ 128).

## CLAIMS FOR RELIEF

All the parties have now been identified and the facts have been laid out. To aid in the analysis that follows, a quick summary of the legal theories advanced in the Complaint is in order.

Count I concerns the seizure of Ron and Cameron from Union Grove School by Michael Richardson; Count II, their confinement at Village Inn; Count III, their seizure from the Alber home by Reginald Richardson; and Count IV, their confinement at Lincoln. Though the facts differ, each count is cut on the same legal template:

—Ron and Cameron assert violations of their Fourth Amendment rights to be free from unreasonable seizures.[16] They also claim violations of a common-law right to be free from unreasonable seizures, as well as violations of the state laws that govern the care of the developmentally disabled.

—All six Albers complain of violations of their rights of association and family privacy as protected by the First and Fourteenth Amendments.

—Relief sought by Albers includes monetary damages, declaratory judgments against the state agencies and their designees who allegedly violated state law, injunctions directing the agencies to develop policies and procedures that will guarantee compliance with the law in future cases, and injunctions directing the delivery of investigative records to Albers and the expungement of those records from the files of the relevant agencies.

Count V concerns Department's order of closure, which labelled the Alber home an unlicensed group facility. Department Defendants have not moved to dismiss Count V, so this opinion will not discuss it further. Any issue-preclusive effect of this opinion on Count V or on the other claims against Department Defendants must be determined at a later date.

## LEGAL SUFFICIENCY OF ALBERS' CLAIMS

Each motion offers a grab bag of legal theories that supposedly command dismissal of the case, or at least the dismissal of certain parties or claims. Some of those theories go to the merits of Albers' constitutional claims, some go to the merits of the common-law and statutory claims, and still others address procedural or technical flaws in Albers' case. As a matter of sound jurisprudence this Court must take up the non-constitutional defenses first, so as to avoid unnecessary consideration of constitutional issues (*Jean v. Nelson*, 472 U.S. 846, 854, 105 S.Ct. 2992, 2996, 86 L.Ed.2d 664 (1985)). By analogy the procedural or technical defenses must also be considered before taking up the substantive, nonconstitutional defenses.

---

16. As always, this opinion adheres to the conventional and convenient (though technically imprecise) practice of referring to the underlying Bill of Rights provisions (which of course imposes limitations only on the federal government) rather than to the Fourteenth Amendment (which applies to state actors and has been construed to embody such Bill of Rights guaranties).

This opinion now considers each motion in turn. Although there is no special principle that dictates the order of treatment, the effort here has been to establish and follow what seems the most logical sequence of handling.

### 1. *P & A Defendants*

P & A and Michael Richardson have filed a joint motion to dismiss Counts I through IV pursuant to Rule 12(b)(6), and Naiditch has filed a separate but virtually identical motion. This section of the opinion discusses the issues common to both motions. Naiditch raises only one unique issue—whether she was timely served—which is taken up below under the heading "Naiditch." P & A Defendants argue that Joshua and Amy lack standing to bring their federal claims, that all the claims are time-barred, that proximate cause is lacking as to Counts III and IV and that neither the Constitution nor the common law recognizes the 1988–vintage Albers as a "family."

### STANDING

■ P & A Defendants concede that if Albers had a constitutional right to family association then Ron, Cameron, Lynne and Herman have standing to litigate such a right. But they argue that Joshua and Amy do not, because siblings have no enforceable rights of family association under Section 1983.

Siblings are undoubtedly "family members" within the general protection of the Supreme Court's cases on family rights. *Bell v. City of Milwaukee*, 746 F.2d 1205, 1246–47 (7th Cir.1984), citing *Moore v. City of East Cleveland*, 431 U.S. 494, 503–05, 97 S.Ct. 1932, 1937–39, 52 L.Ed.2d 531 (1977), has said that statutes that interfere with sibling relationships in an arbitrary and unreasonable way violate the Constitution and must be stricken. *Bell* distinguishes rights from remedies, however, and that distinction is crucial to the present case. It is one thing to decide that state action violates the Constitution, but it may be another matter entirely to hold that action compensable by monetary damages under Section 1983.

*Bell*, 746 F.2d at 1246–47 clearly holds that siblings may use Section 1983 as the vehicle for a facial constitutional challenge to any state action that interferes with their rights of family association. *Bell, id.* at 1247–48 (emphasis added) went on to make the following pronouncement on the availability of damages for siblings:

> Obviously many human relationships stem from the "emotional attachments that derive from the intimacy of daily association," but we are unwilling to attach constitutional significance to such attachments outside the closely guarded parent-child relationship.... *We conclude that under present constitutional authorities the siblings cannot recover under Section 1983.*

It is not entirely clear whether *Bell* laid down an absolute bar to sibling recovery.[17] Four factors figured in the panel's conclusion, and it is worth going through them one by one to see whether they might play out differently in this or any other case.

First *Bell, id.* at 1247, citing *Smith v. Organization of Foster Families*, 431 U.S. 816, 844, 97 S.Ct. 2094, 2109, 53 L.Ed.2d 14 (1977), suggested that courts should consult state law to define the significance of various family relationships where federal law has previously been silent or vague. Wisconsin does not allow siblings to recover for loss of society and companionship, so the *Bell* panel thought it imprudent to extend a comparable right of recovery under federal law. Conversely, it seems clear that if there *were* a damage remedy under state law, our Court of Appeals might permit damages under Section 1983.

■ Reliance on state law seems odd in this context. After all, the absence of analogous state-law torts ordinarily does not preclude recovery under Section 1983 (see, e.g., *Hutson by Hutson v. Bell*, 702 F.Supp. 212, 213–14 (N.D.Ill.1988)). And *Smith*, the Supreme Court case cited by

17. At least one case holds that it does (see the decision of this Court's colleague, Honorable Charles Norgle, in *McBride v. Lindsay*, 718 F.Supp. 24, 26–27 (N.D.Ill.1989).

*Bell* for the state-law-reliance proposition, suggests using such local law to determine whether some legally amorphous collection of people is actually a family—not to determine whether a sibling who obviously *is* a family member can recover damages under Section 1983. But if our Court of Appeals chooses to rely on state law, so must this Court. And Joshua and Amy have no right to recover for the loss of Ron's and Cameron's society under Illinois law.[18] Thus that aspect of the *Bell* analysis cuts against their claim of standing to recover damages under Section 1983.

Next *Bell* relied on two factors that apply generally to all Section 1983 sibling cases. It pointed out that siblings, aunts, uncles, cousins and close friends might all feel so injured by the loss of a child that they would seek damages, but the Court of Appeals saw no principled means of determining whose injuries deserved compensation. So it drew the line at the parents and the child actually victimized by the state action (746 F.2d at 1247). Overdeterrence also troubled the *Bell* court: Even if the right to recover were extended only to siblings, then a single bad act by the defendants could generate separate damage awards for the victim or the victim's estate, the parents and the siblings.

Finally, *Bell* relied on precedent. In a handful of cases the District of Colorado had denied damages recovery for siblings under Section 1983, and those cases provided the support for *Bell's* reliance on "present constitutional authorities" as grounds for denying sibling standing. But the Tenth Circuit has since rejected that position, so that the Colorado cases now lack any force within their own circuit.[19] Moreover, as n. 19 reflects, there appears to be no uniform rule nationally on this issue. To the extent that *Bell* relied on precedent to convert the panel's view of the

particular case into a general rule, then, it may be viewed as undercut somewhat.

Even if the force of precedent were to be discounted for that reason, however, three grounds for the *Bell* decision would still remain: state law, line-drawing and overdeterrence. State law theoretically might outweigh the other two factors: If the federal court could borrow a well-defined state rule that permitted sibling recovery, that could both solve the line-drawing problem that worried the *Bell* court and also lessen its concern about overdeterrence because that same concern had not been persuasive to the Illinois courts. But in this case Illinois state law lends Albers no such help. Taking all factors into account, this Court finds *Bell* compelling here.

To distinguish *Bell* Albers rely entirely on *Aristotle P. v. Johnson,* 721 F.Supp. 1002, 1005–07 & n. 6, 1009–10 (N.D.Ill. 1989). There this Court's colleague Honorable Ann Williams held that siblings have constitutional rights of family association originating in both the associational freedoms of the First Amendment and the substantive due process protections of the Fourteenth Amendment. Having so ruled, Judge Williams found siblings entitled to declaratory or injunctive relief under Section 1983 to enforce those rights. *Aristotle P.* did not authorize damage recovery for siblings, because none was sought. Thus the decision does not contradict *Bell* unless Section 1983 standing is a unitary all-or-nothing concept for siblings.

Albers do want monetary damages for the Section 1983 violations. In Count I they ask for $500,000 each for Ron and Cameron to compensate them for the unlawful seizure and $50,000 for each plaintiff to compensate for the denial of their right to association and privacy; in Count II, $10,000 per day of wrongful confinement to compensate each of Ron and Cameron for their stay at Village Inn; in Count

---

18. For the basis of this conclusion, see the later discussion under the heading "Loss of Society."

19. Since *Bell* came down, *Trujillo v. Board of County Comm'rs of County of Santa Fe,* 768 F.2d 1186, 1189 (10th Cir.1985) has held that siblings may recover damages under Section 1983, specifically rejecting the opposite holding of *Bell.*

Research reveals no consensus on the issue: At least one court agrees with *Trujillo* (*Danese v. Asman,* 670 F.Supp. 729, 739 (E.D.Mich.1987), *rev'd on other grounds,* 875 F.2d 1239 (6th Cir. 1989)) and another with *Bell* (*Pittsley v. Warish,* 927 F.2d 3, 8–9 (1st Cir.1991)).

III, $500,000 each for Ron and Cameron to compensate them for the second seizure and $50,000 for each plaintiff to compensate for the denial of their right to association and privacy; and in Count IV, another $10,000 per day of wrongful confinement to compensate each of Ron and Cameron for their stay at Lincoln. Quite apart from the fact (of which we are periodically reminded by our Court of Appeals, see *TMF Tool Co. v. Muller,* 913 F.2d 1185, 1191 (7th Cir. 1990)) that District Court decisions do not have the force of precedent, this Court is not persuaded by *Aristotle P.* to part company with either the holding or the logic of *Bell.* Instead, because adhering to *Bell* serves to forbid any monetary award to Joshua and Amy, their requests for damages—that is, their actions at law under Section 1983—are dismissed for lack of standing.

Nor is that conclusion altered by another facet of *Aristotle P.*—its suggestion that the First Amendment protects family relationships in ways distinct from the Fourteenth Amendment, so that broader remedies may be available to enforce First Amendment rights (721 F.Supp. at 1007 & n. 6). For that point Judge Williams cites *Roberts v. United States Jaycees,* 468 U.S. 609, 104 S.Ct. 3244, 82 L.Ed.2d 462 (1984), decided just before (but not discussed in) *Bell,* where the Supreme Court offered some guidance on what relationships may and may not fall within the constitutionally protected freedom of association. Albers have asserted claims under both the First and Fourteenth Amendments, presumably intending to advance both incorporation-by-reference rights (see n. 16) and substantive Due Process Clause rights. This Court will not indulge the tenuous notion that sibling damages are somehow available in spite of the *Bell* analysis for the portion of their claims that arises under the First Amendment. Not even *Aristotle P.* itself suggests that Joshua and Amy could recover

damages just because they mentioned the First Amendment in their Complaint, and this Court sees nothing in the *Roberts* analysis to suggest that result.

 To turn from the damages remedy to the other forms of relief prayed in the Complaint, Albers also seek injunctive and declaratory relief for defendants' state-law violations. Such relief is apparently sought both under Section 1983 (on the theory that the state-law violations led to federal constitutional violations) and directly under state law. Specifically, Albers ask for declaratory judgments that P & A exceeded its statutory authority when Michael Richardson seized Ron and Cameron at Union Grove, when he placed them at Village Inn, when he filed the unlawful-facility complaints and when Ron and Cameron were confined at Lincoln; for an injunction barring P & A from seizing or confining Ron or Cameron again; for an injunction ordering Naiditch to adopt policies and procedures that would guard against future violations of the rights of developmentally disabled persons; and for injunctions ordering Naiditch to deliver relevant investigative records to Albers and expunge P & A's records of information about Albers. For the most part Albers lack standing to obtain those sorts of relief from P & A Defendants.

Plaintiffs who seek equitable relief under Section 1983 must first climb the cliff erected by *City of Los Angeles v. Lyons,* 461 U.S. 95, 103 S.Ct. 1660, 75 L.Ed.2d 675 (1983). There the Court held that a plaintiff who has standing to seek damages under Section 1983 does not necessarily have standing to seek injunctive relief.[20] To establish the latter kind of standing the plaintiff must show some "real or immediate threat that the plaintiff will be wronged again in a similar way...." (*id.* at 111, 103 S.Ct. at 1670). Mere conjecture of future

---

**20.** It is worth noting in connection with the just-completed discussion of the siblings' entitlement or nonentitlement to damages that *Lyons* is direct authority for a non-unitary approach to the concept of Section 1983 standing—for the notion that such standing is also a function of what remedy is sought by the plaintiff. Even

though a damages-but-no-injunctive-relief holding is not necessarily precedent for the converse result, it does provide some inferential support for distinguishing *Aristotle P.* from *Bell* (if that were indeed essential to the result this opinion has announced on the sibling-damages issue).

injury will not do the trick. And *Robinson v. City of Chicago*, 868 F.2d 959, 965–66 (7th Cir.1989) has since extended that doctrine to govern standing for declaratory relief as well.

Absolutely nothing in Albers' Complaint supports the conclusion that the Alber family faces any recurring threat of harm from P & A Defendants. Ron and Cameron are living in the Alber home again, apparently in the peaceful conditions that prevailed before 1988. Lynne and Herman are now indisputably their legal parents by virtue of the adoptions. Presumably Lynne and Herman remain Ron's plenary guardians as well and could easily become Cameron's plenary guardians, if they have not done so already. There is no hint of ongoing action by P & A Defendants that is injurious to Albers personally, nor any hint that such action is likely to recur absent an injunction or declaratory judgment. Tracy Zang does remain confined at Village Inn, but she is a nonparty and Albers do not purport to represent her interests in this lawsuit. Nor is this a class action.

Even indulging the most extreme pro-plaintiff perspective permitted by Rule 12(b)(6), it is simply unreasonable to say that Albers have alleged facts sufficient to merit the sort of declaratory relief they seek. Where no such facts are alleged, dismissal of the claims for relief is the proper step (*Kohn v. Mucia*, 776 F.Supp. 348, 355 (N.D.Ill.1991)). All Albers' claims for declaratory relief against P & A Defendants are dismissed for lack of standing.

As for the injunctive claims, Albers certainly have not made allegations sufficient to merit the institutional-reform injunction they seek. Nor have they made allegations sufficient to support an injunction barring P & A from future seizures of Ron or Cameron. Both those requests are dismissed for lack of standing as well. What remains then is the limited request for delivery and expungement of investigative records. That plea for mandatory injunctive relief will be permitted to stand because it is a one-time (and not an ongoing) remedy so closely related to the actual past injury suffered by plaintiffs themselves.

■ Just as Section 1983 is not a fount of non-compensatory relief, any claim for declaratory relief or for wide-ranging injunctive relief raised solely under state law must fail as well. To obtain declaratory relief under Illinois law, "[t]here must be an actual controversy and the party seeking relief must possess a personal claim, status or right which is capable of being affected" (*Bach v. County of St. Clair*, 217 Ill.App.3d 291, 296, 160 Ill.Dec. 282, 285, 576 N.E.2d 1236, 1239 (5th Dist.1991) (citation omitted)). This case presents an actual controversy in which Albers have the requisite personal stake, but that controversy is in the past and the stake is purely monetary—it is not "capable of being affected" by declaratory relief against P & A Defendants. Nothing in the Complaint supports the notion that Albers require any clarification of their rights going forward. All is well in the Alber home, and the adoptions and guardianships provide all the future protection that is needed on the facts of the Complaint.

■ As for injunctive relief, Albers must allege (*Local 1894, AFSCME v. Holsapple*, 201 Ill.App.3d 1040, 1045, 147 Ill.Dec. 404, 407, 559 N.E.2d 577, 580 (4th Dist.1990)):

(a) possession of a certain and clearly ascertained right which requires protection; (b) irreparable injury if the injunctive relief is denied; and (c) lack of an adequate remedy at law.

Again Albers fail the test. They have articulated no basis for a claim of irreparable injury. In that sense the same standing requirement applies to declaratory and injunctive relief: There must be some reasonable basis for fearing future harm if the relief is not granted. Here there is none. Again the request for delivery and expungement of records will be the only injunctive or declaratory request allowed to stand.

To sum up the standing issues: All the Albers lack standing to obtain equitable or declaratory relief against P & A Defendants under either Section 1983 or state law, with the limited exception of the request for delivery and expungement of P & A's investigative records. Joshua and Amy

lack standing to pursue their Section 1983 damages claims, which are dismissed. Joshua and Amy have no other federal claims—their other claims arise solely under state law. That raises the separate question of whether this Court may and should retain jurisdiction over Joshua and Amy as "pendent-party plaintiffs."

### PENDENT–PARTY JURISDICTION I: JOSHUA AND AMY [21]

■ All the Albers have sued the same defendants, alleging the same sort of injuries arising from the same course of events. But Joshua and Amy have no standing to sue under Section 1983, so that there is no independent basis for federal jurisdiction over them. To remain here they must qualify in terms of what before Section 1367 was termed "pendent-party jurisdiction"—the doctrine under which federal courts have heard state-law claims by or against parties otherwise not subject to federal jurisdiction.

At least until the decision in *Finley v. United States*, 490 U.S. 545, 109 S.Ct. 2003, 104 L.Ed.2d 593 (1989), such pendent-party jurisdiction was potentially available if (1) the state-law claims were part of the same Article III case or controversy as the federal claims before the court and (2) "Congress ha[d not] limited the court's power to exercise such jurisdiction in the specific statutory provision conferring federal jurisdiction in the case" (*Huffman v. Hains*, 865 F.2d 920, 922 (7th Cir.1989) (citation omitted)). If those two conditions were met, a district judge has had the discretion to exercise pendent-party jurisdiction but has not been compelled to do so (*Huffman*, 865 F.2d at 923)).

Of course a putative pendent-party plaintiff must plead a valid state claim. There is a good deal of reason to doubt that Joshua and Amy in fact have any such valid claims. But a decision on pendent-party jurisdiction must precede, and may preclude, any discussion of state-law merits issues.

This case thus presents the question whether pendent-party jurisdiction may be exercised in a Section 1983 case removed from state court, when the case has been brought after *Finley* and before the effective date of the Section 1367 supplemental jurisdiction statute. That statement of the issue requires a little explanatory background.

Before *Finley* came down, *Moore v. Marketplace Restaurant, Inc.*, 754 F.2d 1336, 1359–61 (7th Cir.1985) (separate opinions of Judge Posner and Senior Judge Gibson) had explicitly upheld the exercise of jurisdiction over a pendent private-party *defendant* in a Section 1983 case. That sort of jurisdiction was thought to be consistent with the purposes of Section 1983 under the second, statutory step of the *Huffman* test. Pendent-*plaintiff* jurisdiction was generally frowned upon but not always forbidden (*Thomas v. Shelton*, 740 F.2d 478, 487 (7th Cir.1984)). It appears that our Court of Appeals never addressed the issue in a Section 1983 case.

*Finley* rejected pendent-party jurisdiction under the Federal Tort Claims Act. Justice Scalia's opinion for the five-Justice majority was unmistakably hostile to such jurisdiction generally but did not flatly eliminate it. *Finley*, 490 U.S. at 553, 109 S.Ct. at 2009 cited the absence of an "affirmative grant" of pendent-party jurisdiction in the FTCA as grounds for rejecting such jurisdiction in that context. Though our Court of Appeals has not since addressed the question in the Section 1983 matrix, other courts have.

Some of those courts have found that Section 1983 contains no such "affirmative grant," so that pendent-party jurisdiction is forbidden (see, e.g., *Sarmiento v. Texas Bd. of Veterinary Medical Examiners*, 939 F.2d 1242, 1248 (5th Cir.1991); *Ortega v. Schramm*, 922 F.2d 684, 691 (11th Cir. 1991) (per curiam); cf. *Commonwealth Edison Co. v. Westinghouse Elec. Co.*, 759 F.Supp. 449 (N.D.Ill.1991), adopting in a RICO case an expansive reading of *Finley*

---

**21.** In the best Hollywood fashion, this opinion later offers a sequel entitled "Pendent–Party Jurisdiction II: NHRI."

as barring *all* pendent-party jurisdiction absent an affirmative statutory grant of authority). But *Finley* has elsewhere been read to mean only that pendent-party jurisdiction must be broadly consistent with the underlying jurisdictional statute—in the case of Section 1983 actions, 28 U.S.C. § 1343. That reading leads to the conclusion that pendent-party jurisdiction remains available under Section 1983 despite *Finley* (see *Rodriguez v. Comas*, 888 F.2d 899, 905–06 (1st Cir.1989) and *Carter v. Dixon*, 727 F.Supp. 478, 479 & n. 1 (N.D.Ill.1990), the latter of which upheld pendent-plaintiff jurisdiction in a Section 1983 case removed from state court). *Carter, id.* sees *Finley* as merely restating the second step of the *Huffman* test. On such a reading *Moore* would survive, and district judges would retain the discretion to assert pendent-party jurisdiction over a private-party defendant to a Section 1983 action.

This is a knotty problem.[22] To begin with, it should be clear that *Finley* does not require an *express* statutory grant of pendent-party jurisdiction. It teaches (490 U.S. at 551, 109 S.Ct. at 2007) that a lower court may find pendent-party jurisdiction authorized by statute in the absence of an express grant, based on consideration of (1) the posture or context of the nonfederal claim and (2) the specific statute that authorizes jurisdiction. In light of Justice Scalia's regular insistence on clarity, it is fair to assume that if he (or more accurately the Court) meant to lay down a bright-line rule equating "affirmative grant" with "express grant" he would have said and done so. By the *Finley* opinion's willingness to explore the underlying purposes reflected by the statutory language of the FTCA, it signals lower courts that an "affirmative grant" may be found by implication even though not stated in plain and simple terms. So the fact that neither Section 1983 nor Section 1343 expressly provides for pendent-party jurisdiction does not end the inquiry.

At the same time, with all due respect to the contrary conclusion reached by this Court's former colleague Honorable Nicholas Bua in *Carter, Finley* clearly replaces the second prong of the *Huffman* test with a more stringent inquiry. Under *Huffman* our Court of Appeals used to ask whether Congress had *limited* the courts' power to assert jurisdiction over pendent parties. If the answer in a particular case were no, the court had the discretion to exercise that sort of jurisdiction. *Finley* substitutes the opposite question, and with it substitutes a materially more restrictive attitude toward pendent-party jurisdiction. Now courts must ask if Congress has sent a clear signal *permitting* pendent-party jurisdiction. If the answer in the specific case is no, then the court lacks any discretion to assert such jurisdiction. *Finley* in effect substitutes a presumption against pendent-party jurisdiction for *Huffman*'s presumption in favor.

To move on in the analysis, *Finley* requires consideration of the "posture or context" of the case. Just what that means is fuzzy. *Finley*, 490 U.S. at 551, 109 S.Ct. at 2007 said that the most important aspect of that case's "posture" or "context" was that there was no independent ground for federal jurisdiction over the putative pendent parties. That at least suggests that "posture" or "context" is irrelevant—for if the most prominent aspect of posture or context in a pendent-party situation is the lack of federal jurisdiction, then by definition posture or context can never cut in favor of pendent-party jurisdiction. To be sure *Rodriguez*, 888 F.2d at 906 held that to look at "context" meant looking at whether the claim by a pendent party "intersect[s] with the objectives and concerns of section 1983." If that broader view of posture or context were the correct one, Albers would have a good case for pendent-party jurisdiction, for their false imprisonment and statutory claims against NHRI clearly further the broad remedial purposes of Section

---

**22.** So knotty, in fact, that even the distinguished Judge John Minor Wisdom might be viewed as having come down on both sides of the issue. Contrast *Rodriguez* (authored by Judge Wisdom, sitting by designation, approving pendent-party jurisdiction under Section 1983) with *Sarmiento* (rejecting such jurisdiction in an opinion joined by Judge Wisdom as a panel member).

1983. But *Rodriguez* seems to ignore *Finley* on that score.

*Finley* also requires consideration of the jurisdictional statute or statutes. Here there are really two bases for jurisdiction, Section 1343(a)(3) and Section 1441, and this Court must consider both. Section 1343(a)(3) enables the federal courts to hear cases arising under Section 1983 by granting original jurisdiction over:

> any civil action authorized by law to be commenced by any person.... [t]o redress the deprivation, under color of any State law, statute, ordinance, regulation, custom or usage, of any right, privilege or immunity secured by the Constitution[.]

*Rodriguez*, 888 F.2d at 906 took the words "any civil action" and "any person" as evidence that Congress had made an "open-ended" jurisdictional grant applicable to pendent parties (at least plaintiffs). But *Finley*, 490 U.S. at 549, 109 S.Ct. at 2006 specifically mandates courts to construe jurisdictional statutes narrowly. In Section 1343(a)(3) the words "authorized by law" must be read as words of limitation, incorporating by reference the substantive "law" of Section 1983. That statute authorizes suits only to remedy actions taken by "persons" (a term of art—contrast, e.g., *Monell v. Department of Social Services*, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978) with *Will v. Michigan Dept. of State Police*, 491 U.S. 58, 109 S.Ct. 2304, 105 L.Ed.2d 45 (1989)) "under color of law" (another term of art often shorthanded in "state actor" terms) that cause the deprivation of federal constitutional or statutory rights.

By its focus on "persons" Section 1983 insulates corporate entities from respondeat superior liability. By its emphasis on "color of law" Section 1983 appears to exclude private-party defendants who have not been deemed state actors—an issue that this opinion has not dealt with, so that at least for the moment Albers will be granted the arguendo assumption that NHRI was a state actor. By its emphasis on deprivation of federal rights, Section 1983 excludes jurisdiction over a defendant who has violated only the plaintiff's state-law rights.

Under the principles of construction announced in *Finley* there is nothing here that could reasonably be interpreted as an "affirmative grant" of jurisdiction over pendent parties (*Ortega*, 922 F.2d at 691). Hence review of the statutory language leads inexorably to the conclusion that *Finley* forbids the exercise of pendent-party jurisdiction in a case where Section 1983 and Section 1343(a)(3) provide the only grounds for federal jurisdiction.

■ In this case, though, there is still another ground for federal jurisdiction: the removal statute, Section 1441. Recall that Albers sued in state court, and that this case came to federal court only because defendants brought it here under Section 1441(b), which authorizes removal of civil rights cases where the federal courts have original jurisdiction. Read in isolation, Section 1441(b) sheds no light on the question of pendent parties. More relevant for *Finley* purposes is Section 1441(c):

> Whenever a separate and independent claim or cause of action within the jurisdiction conferred by section 1331 of this title, is joined with one or more otherwise non-removable claims or causes of action, the entire case may be removed and the district court may determine all issues therein, or, in its discretion, may remand all matters in which state law predominates.[23]

Those who have considered the problem have singled out that statute as a prime candidate for the exercise of pendent-party jurisdiction under the *Finley* test (see, e.g., *Ortega*, 922 F.2d at 691 n. 8; *Simmons v. California Dept. of Industrial Relations*, 740 F.Supp. 781, 789 n. 15 (E.D.Cal.1990); 13B Charles Wright, Arthur Miller & Ed-

---

**23.** This is the language of Section 1441(c) in force after its 1990 amendment (and hence after this case was removed from the state court). But because the 1990 amendment *narrowed* the removability provisions, a reading that finds that the current version of the statute involves an "affirmative grant" of jurisdiction in *Finley* terms would apply a fortiori to the statute as of the time of the notice of removal here.

ward Cooper, *Federal Practice & Procedure* § 3567.2 n. 48 (1991 pocket part). Section 1441(c) explicitly authorizes the district courts to retain jurisdiction over "nonremovable claims or causes of action": those where an independent basis for federal jurisdiction is lacking. It refers to "claims or causes of action" and not to parties, but the quoted language is broad indeed—broad enough so that it must include claims that are not independently removable for any number of reasons, including the absence of federal jurisdiction over a party. Nothing in the statute suggests that claims made non-removable by the presence of a pendent party *must* be remanded.

Section 1441(c) thus appears to contain an "affirmative grant" of pendent-party jurisdiction within the meaning of *Finley*. Congress has made clear that defendants who remove a mixed bag of claims to federal court may have them all heard in federal court if the judge is willing. Just as Judge Bua did in *Carter* (albeit on a much different view of the post-*Finley* viability of the *Huffman* analysis), this Court holds that regardless of the availability vel non of pendent-party jurisdiction under Section 1983, it is permissible to assert jurisdiction over a pendent-party plaintiff in a Section 1983 case removed from state court.[24]

That in turn leads to the question whether this Court will indeed exercise its discretionary jurisdiction over Joshua and Amy. And that demands consideration of the threshold question avoided above: whether Joshua and Amy in fact have a valid state-law cause of action. As will be made clear, this Court believes they do not and must thus dismiss them as parties.

## STATUTE OF LIMITATIONS

■ Next comes P & A's contention that all the Section 1983 claims are time-barred.

All Section 1983 suits arising in Illinois are subject to a two-year statute of limitations (see, among the numerous reconfirmations of that rule, *Pearson v. Gatto*, 933 F.2d 521, 525 n. 3 (7th Cir.1991), citing *Kalimara v. Illinois Dept. of Corrections*, 879 F.2d 276, 277 (7th Cir.1989)). Albers filed their state-court lawsuit on June 29, 1990. Therefore the limitations clock has run on claims that antedated June 29, 1988.

Here is what happened *before* that limitations watershed: On April 28, 1988 Michael Richardson removed Ron and Cameron from Union Grove School and took them to Village Inn. Ron and Cameron remained confined there for several weeks. Cameron left on June 28 and Ron on July 15. Those events are covered by Counts I and II. P & A Defendants contend that the statute of limitations compels the dismissal of those counts.

Here is what happened during the period between the limitations watershed date and the filing of this lawsuit: In late July or early August 1988 Michael Richardson filed the complaints that triggered the second removal of Ron and Cameron and their confinement at Lincoln Developmental Center. Those events are covered by Counts III and IV. P & A Defendants do not claim that those counts are time-barred, but instead seek their dismissal on other grounds discussed later in this opinion.

Any aspects of the lawsuit based exclusively on the events preceding June 29, 1988 are quite clearly time-barred, unless some exception to the statute of limitations applies. In this instance Illinois law does supply such an exception applicable to both Ron and Cameron.

■ Along with the applicable state statute of limitations and so long as there is no federal tolling provision to the contrary, federal courts hearing Section 1983 cases must borrow state tolling law, includ-

---

**24.** One caveat should of course be issued at this point. Because a different view of the issue just discussed at length is more than respectable and might be adopted by another court (most importantly, by our Court of Appeals), the cautious litigant would probably do better to pursue (or to oppose) the claim of the pendent-party plaintiff in state court, where jurisdiction is unques-

tionable (see the bitter lesson taught in such cases as *Ross v. Inter–Ocean Ins. Co.*, 693 F.2d 659 (7th Cir.1982), under which the losing party—whether plaintiff or defendant—always has a free shot at undoing an unfavorable judgment by challenging the doubtful existence of subject matter jurisdiction on appeal).

ing the tolling law applicable to persons with legal disabilities (*Bailey v. Faulkner,* 765 F.2d 102, 104 (7th Cir.1985)). That requires this court to link the Illinois tolling statute (Ill.Rev.Stat. ch. 110, ¶ 13–211 ("Section 13–211"[25]) to its two-year limitations period (*id.* ¶ 13–202). Here is Section 13–211:

> If the person entitled to bring an action, specified in Sections 13–201 through 13–210 of this Act, at the time the cause of action accrued, is under the age of 18 years, or is under a legal disability, then he or she may bring the action within two years after the person attains the age of 18 years, or the disability is removed.

Illinois courts have expressly defined "legal disability" to include *"mental incompetency"* and have invoked Section 13–211 when the "claimant was entirely without understanding or capacity to make or communicate decisions regarding his person and totally unable to manage his estate or financial affairs" (*Estate of Riha v. Christ Hosp.,* 187 Ill.App.3d 752, 755–56, 135 Ill. Dec. 907, 908–09, 544 N.E.2d 403, 404–05 (1st Dist.1989) (citation omitted, emphasis in original)). That test applies to an "undoubtedly retarded" plaintiff (*Peach v. Peach,* 73 Ill.App.2d 72, 83–84, 218 N.E.2d 504, 509 (2d Dist.1966).[26] In *Peach* the court found that the plaintiff, while retarded, was not incompetent. So the case does not hold that all retarded persons are legally incompetent—a point well taken, for there are many degrees of retardation (*Grady,* 405 A.2d at 855) and plenty of retarded persons are capable of making

significant life decisions. But *Peach* does demonstrate that a permanent and irremediable disability such as retardation *can* toll the statute of limitations. Plainly the tolling rule is not limited to (although it does encompass) conditions likely to abate over time, such as infancy or psychiatric illness.[27]

No prior adjudication of incompetence is required to trigger that exception to the statute of limitations. It is enough that the complaint allege facts sufficient to prove legal disability (*Riha,* 187 Ill.App.3d at 755–56, 135 Ill.Dec. at 909, 544 N.E.2d at 405). Nor does it matter if the incompetent person acquires a legal guardian capable of bringing suit on his or her behalf, as Cameron did on June 28, 1988. Appointment of a guardian for an incompetent does not trigger the running of the statute (*Mazikoske v. Firestone Tire & Rubber Co.,* 149 Ill.App.3d 166, 178, 102 Ill.Dec. 729, 737, 500 N.E.2d 622, 630 (1st Dist.1986)).

By the standards just outlined the Complaint plainly labels Ron and Cameron as having been "under a legal disability" at all times relevant to this case. Each had multiple handicaps, including a low I.Q. and "significantly subaverage intellectual functioning with concurrent deficits and impairments in adaptive behavior relative to their ages" (¶ 53). Because of those handicaps Ron and Cameron have always been "totally and functionally incapable ... of making any voluntary or informed decisions about their personal care, treatment or custody" (¶¶ 53–54).

---

**25.** That "Section" usage comports with the Illinois General Assembly's use of that word and of the symbol "§" in its enactments, even though the publisher of the Smith–Hurd annotated version of the Illinois statutes has chosen to shift to "¶" instead.

**26.** *Peach* actually interpreted the predecessor statute to Section 13–211, but its test for legal disability comports precisely with the test of *Riha* and other cases applying Section 13–211 (218 N.E.2d at 509):

> We believe that the words "insane" or "mentally ill" as used in the Illinois Statute of Limitations contemplate that the sufferer could not comprehend the nature of the act

giving rise to his cause of action or his rights, and that his condition is such as to require care in a hospital or under a guardian or conservator for his own welfare or the welfare of others.

**27.** Under the common-law doctrine that gave rise to the contemporary tolling statute, even a delay of *42 years* in bringing suit has been held permissible in a case brought on behalf of an incompetent plaintiff (*Van Buskirk v. Van Buskirk,* 148 Ill. 9, 35 N.E. 383 (1893)). In this case the delay is at most two months, so any possible argument that general equitable considerations should trump the tolling statute would be entirely misplaced.

On the other side of the ledger are the expressions of consent that Ron and Cameron gave Michael Richardson before he removed them from Union Grove and the written consent forms they signed upon their admission to Village Inn. P & A Defendants may hope to prove that Ron and Cameron were really capable of giving meaningful consent to those actions. But on a motion to dismiss the Complaint compels the inference that these expressions of consent were a nullity. "[I]n the case of plaintiffs who are severely retarded, informed consent is not even possible" (*Association for Retarded Citizens of North Dakota v. Olson*, 561 F.Supp. 473, 484 (D. N.D.1982)).

What has been set out here is more than sufficient to establish for pleading purposes that Ron and Cameron were incompetent and is therefore ipso facto sufficient to toll the statute of limitations. Ron and Cameron can pursue any and all of their claims in this case notwithstanding any statute of limitations objections that might bar the similar claims of a mentally competent plaintiff. This conclusion applies not only to their Section 1983 claims but also to any of their state-law claims that might be governed by Section 13–211.

■■■ Next comes the question whether Lynne's and Herman's Count I and II Section 1983 claims are time-barred. Obviously neither of them can (or does) claim any sort of legal disability. Nonetheless they argue that their claims are not time-barred because the constitutional violation alleged in Counts I and II continued until Ron and Cameron were released from Village Inn (Alber Mem. 12). In Cameron's case, then, the violation continued until June 28, 1988—but that does not help Lynne and Herman because a cause of action ending on that date is out of time anyway. In Ron's case the violation continued until July 15, 1988—but *that* is irrelevant because the length of confinement does not dictate when the cause of action accrued.

As with most types of lawsuits, a claim for relief under Section 1983 generally accrues, and the statute of limitations begins to run, "when a plaintiff knows or has reason to know of the injury which is the basis of his action" (*Compton v. Ide*, 732 F.2d 1429, 1432 (9th Cir.1984); *Martin v. Anderson*, No. 89 C 8460, 1991 WL 211243, * 2, 1991 U.S.Dist.LEXIS 14194, * 5 (N.D.Ill. Sept. 30, 1991)). When the gravamen of the claim is some sort of wrongful confinement, the plaintiff naturally knows or has reason to know of the injury from the fact of confinement itself. Hence the claim accrues on day one of that confinement (see, e.g., *id.* 1991 WL 211243 at * 2, 1991 U.S. Dist.LEXIS 14194 at * 6; *Phelps v. Klipfel*, No. 91 C 4742, 1991 WL 285279, * 3, 1991 U.S.Dist.LEXIS 18396, * 9 (N.D.Ill. Dec. 26, 1991)). Each day of confinement then extends or magnifies the initial injury, so that the duration of confinement may be relevant to damages. But each day of confinement does *not* constitute a fresh constitutional violation that resets the statute of limitations time clock to zero.

Here the predicate for Lynne's and Herman's charges is the wrongful seizure and confinement of a third party, so the relevant date would be the day that they (and not the person confined) learned about the seizure and confinement. It is not clear from the Complaint just when they learned. But they do not allege that they were kept in the dark, and the reasonable inference most favorable to them is that they knew of the confinement at the latest by May 23, when Cameron's natural parents filed their guardianship petition. Therefore all the claims of Lynne and Herman accrued before June 28, 1988.

■■■ Albers apparently vest their hopes in "the general principle that the statute of limitations does not begin to run on a continuing wrong till the wrong is over and done with" (*Taylor v. Meirick*, 712 F.2d 1112, 1118 (7th Cir.1983)). To be sure, in appropriate cases a plaintiff may invoke that principle to reach back in time and yank otherwise time-barred incidents (or, more accurately, their non-time-barred effects) forward into the limitations period. *Malhotra v. Cotter & Co.*, 885 F.2d 1305, 1310 (7th Cir.1989) (citations omitted) has framed the concept in these terms:

There must be a violation within the period of the statute of limitations. If, having proved such a violation, the plaintiff goes on to prove that it began earlier and that its earlier manifestation caused him additional injury, he can obtain a remedy for the increment as well as for the injury inflicted by the recent violation.

There are two requirements for bringing that principle into play. Unfortunately for Lynn and Herman, they are able to satisfy only one and not both of those prerequisites.

First "[t]here must be a violation within the period of the statute of limitations" (*id.*). That is, there must be at least one act within the limitations period that would entitle the plaintiff to recover even if no other violation had ever occurred. That first requirement is satisfied by the factual allegations sued upon in Counts III and IV.[28]

Second, it must "have been unreasonable to require the plaintiff to sue separately" on each violation predating the limitations period (*id.*). That test is the hurdle at which Lynne and Herman not only stumble but fall. For the same reasons as already given in this opinion's discussion of accrual of the claim, it is eminently reasonable to say that Albers could and should have been on notice that the time to bring suit ran from the time that the infringement of their constitutional rights first occurred.

In theory the continuing wrong doctrine "is a general principle of our law" (*id.*), just as applicable to Section 1983 as it is to copyright (*Taylor*, 712 F.2d at 1118), to race discrimination under 42 U.S.C. § 1981 (*Malhotra*, 885 F.2d at 1310) or to any other body of substantive law. In practice, though, it must be recognized that many of the kinds of torts typically alleged under the rubric of Section 1983—interference with freedom of speech or religion, wrongful confinement, mistreatment by police and the like—tend to be as plainly apparent to the victim as common-law assault and battery.

Contrast such situations with the knottier problems encountered in many civil rights cases—such as those involving, for example, employment discrimination, where a plaintiff often has "no reason to believe he was a victim of discrimination until a series of adverse actions established a visible pattern of discriminatory mistreatment" (*id.*). Other tort contexts may also supply compelling reasons why a cause of action does not accrue until the last tortious act, but those contexts tend to be very different from the present one.

One example is the continuing administration of harmful drugs in a products liability case, where it has been held that the final exposure to the drug triggered accrual of the cause of action (*Meadows v. Union Carbide Corp.*, 710 F.Supp. 1163, 1166 (N.D.Ill.1989)[29], citing and following *Page v. United States*, 729 F.2d 818 (D.C.Cir. 1984)). Another example is the gradual injury to real property resulting from the rising waters of a dam. In *United States v. Dickinson*, 331 U.S. 745, 67 S.Ct. 1382, 91 L.Ed. 1789 (1947) injury to the property was plainly visible early on, but the suit was not filed by the time the limitations

---

**28.** See the discussion on proximate cause that follows.

**29.** In *Meadows* this Court's colleague Honorable James Moran speaks of a cause of action as accruing on the date of the last tortious act, while in *Malhotra* Judge Posner speaks instead of reaching back beyond the limitations period to permit a larger damage award. In still other situations (the antitrust cases are perhaps the prime example, and a number of courts including this one apply the same concept in RICO cases) the approach is one of a rolling statute of limitations, with each violation by the defendant being actionable and starting its own limitations clock ticking. *Meadows* seems most problematic, for its corollary is that there is no cause of action until the last tortious act occurs (the corollary of which is that a suit brought earlier, followed by another tortious act, might actually be dismissed as premature—surely a bizarre result). But whatever the locution, those situations do *not* support a rule disregarding the limitations bar where as here (1) the events constituting the violation of a plaintiff's constitutional rights occurred outside of the limitations period, (2) those events were clearly actionable in and of themselves when they occurred and (3) what occurred during the non-time-barred period was a discrete and independently actionable constitutional violation.

period expired—that is, if the cause of action had been deemed to accrue at the point when the injury first became known. But the Supreme Court held that the "source of the entire claim—the overflow due to rises in the level of the river—is not a single event; it is continuous," so that it would be natural for the owner to postpone bringing suit "until the consequences of inundation have so manifested themselves that a final account may be struck" (*id.* at 749, 67 S.Ct. at 1385). Hence the "taking" that was the gravamen of the owner's claim was held not to be complete until a later date.

This is not to say that the continuing wrong doctrine will never apply to Section 1983, a ruling that would be both unwise and unnecessary to decide this case. But to apply it here would be no more logical than it would be to permit suit on a claim where the tortious act occurred outside the limitations period simply because its effects have continued to be felt into the time frame not yet barred by limitations (cf. *Delaware State College v. Ricks*, 449 U.S. 250, 258, 101 S.Ct. 498, 504, 66 L.Ed.2d 431 (1980), as well as the classic conventional tort case with a plaintiff suffering lasting residual damage). Lynne's and Herman's Section 1983 claims under Counts I and II are time-barred and must be dismissed.

## PROXIMATE CAUSE

P & A Defendants concede that Counts III and IV are not time-barred, but they argue that the events covered by those counts "do not support a § 1983 action" against them (P & A R.Mem. 6). That argument is made rather offhandedly, without any citation to authority. In fact, this opinion has just quoted the entire discussion of the issue in the P & A Defendants' brief. It looks like a proximate cause argument, so that is how this Court will analyze it.

■■■ Section 1983 embodies traditional common-law concepts of causation and injury. Plaintiff must prove first that "the [unconstitutional] conduct complained of was committed by a person acting under color of state law" (*Parratt v. Taylor*, 451 U.S. 527, 535, 101 S.Ct. 1908, 1913, 68 L.Ed.2d 420 (1981)) and second that (*Papapetropoulous v. Milwaukee Transport Services, Inc.*, 795 F.2d 591, 595 (7th Cir. 1986) (emphasis added, citation omitted)):

a causal connection must exist between the defendant's actions and the injury resulting from the constitutional violation. "Section 1983 creates a cause of action based upon personal liability and predicated upon fault. An individual cannot be held liable in a § 1983 action unless he *caused or participated in* an alleged constitutional deprivation."

■■■ P & A Defendants committed three affirmative acts in the time period covered by Counts III and IV: Michael Richardson filed the complaints that triggered Department's decision to remove Ron and Cameron from the Alber home and to take them to Lincoln Developmental Center. No injury flowed from the complaint filed with DPH or the one filed with the Whiteside County State's Attorney. Department, on the other hand, did conduct an investigation, remove Ron and Cameron from the Alber home and place them in Lincoln Developmental Center.

As this Court has said in *Payne v. City of LaSalle*, 610 F.Supp. 606, 608 n. 4 (N.D.Ill.1985) (emphasis in original), Section 1983 tracks conventional tort law in that respect:

[T]he test of liability is that the defendant must have been *a* proximate cause, not *the* proximate cause, of plaintiff's injuries.

So the question is whether Michael Richardson's filing of the complaint may be deemed *a* proximate cause of the removal. P & A Defendants evidently mean to counter with "the familiar defense of intervening or supervening cause" (*id.*). In other words, they mean to argue that Department's actions were sufficiently independent so that P & A Defendants' filing of the complaint cannot constitute a proximate cause of the removal and confinement.

Rule 12(b)(6) principles come to Albers' rescue. On such a motion to dismiss, this Court must grant the pro-Albers inference that Michael Richardson's complaint to De-

partment was somehow tainted—an unfounded and perhaps retaliatory effort to separate Lynne and Herman from their surrogate children, not based on any bona fide belief that the Alber home was an "unlicensed facility."[30] Furthermore, it is reasonable to infer that Department based its actions not only on information obtained during its own investigation but also on information contained in the complaint—or on the mere fact that a protective services worker (presumably more credible in Department's eyes than an ordinary citizen) filed what was instead a tainted complaint in the first place.

Intervening or supervening cause provides no defense where the second tortfeasor's actions "are of precisely the type the first tortfeasor ... had reason to know would be encouraged by its own misconduct" (*Payne*, 610 F.Supp. at 608 n. 4). At least in its present posture this case presents just such a scenario: P & A Defendants are not necessarily insulated from liability by the fact that Department conducted the investigation, removal and placement without their direct assistance. Therefore whichever Albers survive dismissal for other reasons may pursue their Section 1983 claims under Counts III and IV.

## LOSS OF SOCIETY

P & A Defendants ask this Court to dismiss Albers' common-law claims. Those claims are so sloppily advanced that it is hard to know just what this Court is being asked to dismiss. All the Complaint says is that the same acts that allegedly violated Albers' constitutional rights also violated their common-law rights (see, e.g., ¶¶ 137(a)(i) and (ii) and ¶¶ 160(a)(i) and (ii)). P & A Defendants chose to brief the issue of loss of society. Albers responded with a brief about the same tort, placidly allowing defendants to define the rights at issue.[31]

Counsel for plaintiffs are usually expected first to be more specific in drafting a complaint, and then to be more assertive about protecting plaintiffs' right to define the doctrinal playing field of the case. This Court will not go in search of common-law claims where plaintiffs have not. This discussion will rather be limited to the issues raised in the briefs.

It appears that all six Albers seek damages for loss of society. But Illinois law recognizes no general right of family members to recover for loss of society. Parents, siblings and children have different rights, depending on the type of injury and the nature of the family relationship injured by the tortfeasor (*Seef v. Sutkus*, 145 Ill.2d 336, 340, 164 Ill.Dec. 594, 596–97, 583 N.E.2d 510, 512–13 (1991) (Miller, C.J., specially concurring)). So it is necessary to break down the catchall claim into the separate claims (1) of Lynne and Herman for the loss of society of Ron and Cameron, (2) of Joshua and Amy for the loss of society of Ron and Cameron and (3) of Ron and

---

**30.** Albers would have to prove the truth of that assumption, or some closely related variant of it, if they are ultimately to recover for any of the constitutional violations alleged in the Complaint. Otherwise P & A Defendants and Department Defendants doubtless could invoke the well-settled principle of qualified immunity for child care workers conducting abuse and neglect investigations (see, e.g., *Landstrom v. Ill. Dept. of Children & Family Services*, 892 F.2d 670, 674–78 (7th Cir.1990), affirming this Court's opinion at 699 F.Supp. 1270 (N.D.Ill. 1988)). To defeat that defense a plaintiff may show that the case "lacks circumstances indicative of an emergency and there are claims of retaliatory motive which must be considered" (*Snell v. Tunnell*, 920 F.2d 673, 697 (10th Cir. 1990)). *Snell* also teaches that to prove a Fourth Amendment claim in this context, Ron and Cameron must introduce "specific evidence tending to show that the allegations of child abuse were fabricated and that the defendants knew that such allegations were untrue" (*id.* at 698)—a standard roughly applicable to the other constitutional claims in this case as well.

**31.** On a related point, NHRI Defendants have asked this Court to dismiss the common-law claims made against them in Count II. It appears that Albers intended to press the same common-law claims against both NHRI and against P & A Defendants, although NHRI briefed the issue of false imprisonment and P & A briefed the issue of loss of society—a pretty good clue to the opacity of Albers' pleading. Therefore the discussion of loss of society in this opinion is deemed applicable to NHRI, while the false imprisonment claim is also deemed applicable to P & A (which has not challenged the legal sufficiency of that claim).

Cameron for the loss of society of the other four Albers.

■ As for Lynne and Herman, in their briefs the parties have focused on whether Illinois permits a non-biological parent to recover for loss of filial society. It is unnecessary to resolve that issue, however, because even a biological parent could not recover on the facts of this case.

Illinois parents may not recover for loss of filial society when the child's injuries are nonfatal and the parent's injury is merely "the derivative consequence of an injury to the child," as in a medical malpractice case where the child and not the parent was the recipient of the flawed care (*Dralle v. Ruder*, 124 Ill.2d 61, 73, 124 Ill.Dec. 389, 394–95, 529 N.E.2d 209, 214–15 (1988)). *Dralle* explicitly left open the question whether damages may be awarded for loss of society resulting from acts that "intentionally and directly interfer[e] with the parent-child relationship" (*id.* at 73, 124 Ill.Dec. at 394, 529 N.E.2d at 214). Albers allege that they were physically separated over the course of many weeks by the deliberate acts of third parties—the sort of intentional and direct interference that the Illinois Supreme Court appears to have had in mind in its disclaimer. Therefore this case squarely poses the question that was left open by *Dralle.*

When a federal court must decide a truly novel issue of state law, its job is to predict what the state's high court would do if confronted with the same issue (cf. *Miller v. Pardner's, Inc.*, 893 F.2d 932, 934 (7th Cir.1990)). Where the only reported decisions are from one or more Illinois Appellate Districts without any later signals from the Illinois Supreme Court, there are differing federal views as to the approach to be taken in deciding the issue (contrast numerous of this Court's opinions such as the Appendix in *Rizzo v. Means Services*, 632 F.Supp. 1115, 1131–33 (N.D.Ill.1986), which follow the established Illinois choice-of-law principles that bind its own trial courts, with cases of which the next-dis-cussed *Kunz v. Deitch* opinion is an example, which take no account of the applicability of *Erie v. Tompkins* doctrine to those choice-of-law principles but instead view *Erie v. Tompkins* as calling only for an Illinois–Supreme–Court–predictive process). As the precedential situation exists here, it proves unnecessary to choose between those approaches.

Two pre-*Dralle* cases had permitted recovery for intentional nonfatal interference with the parent-child relationship. *Kunz v. Deitch*, 660 F.Supp. 679, 682 (N.D.Ill.1987) (a diversity case), had predicted that the Illinois Supreme Court would recognize a parent's claim for loss of society against his child's grandparents, who had put the child up for adoption against his wishes and without his knowledge or approval. *Dymek v. Nyquist*, 128 Ill.App.3d 859, 83 Ill.Dec. 52, 469 N.E.2d 659 (1st Dist.1984) had recognized a parent's claim against a former spouse and a psychiatrist who had tried to destroy the child's relationship with the plaintiff.

One pre-*Dralle* case had held that there is no such right of recovery. *Whitehorse v. Critchfield*, 144 Ill.App.3d 192, 98 Ill. Dec. 621, 494 N.E.2d 743 (4th Dist.1986) had ruled that the Illinois legislature and not its courts should be the first to recognize a cause of action for loss of a child's society. But *Kunz*, 660 F.Supp. at 683 found it wrong to rely on the argument of institutional reluctance, citing *Bullard v. Barnes*, 102 Ill.2d 505, 82 Ill.Dec. 448, 468 N.E.2d 1228 (1984) for the proposition that the Illinois Supreme Court was willing to expand tort liability in appropriate cases without legislative action.

If those three cases were the only stars in the decisional firmament, this Court's stellar navigation would lead it to the same destination as *Dymek* (and incidentally *Kunz* )—the recognition of a cause of action for intentional interference with the parent-child relationship—under either of the two approaches to determining Illinois law that were described a few paragraphs back.[32] But the later-decided *Dralle* case

---

**32.** There appears to be no consensus on the question in other jurisdictions (contrast *Murphy*

*v. I.S.K. Congregation of New England, Inc.*, 409 Mass. 842, 571 N.E.2d 340 (1991) (recognizing

calls for a different conclusion whichever approach is taken.

*Dralle,* 124 Ill.2d at 71, 124 Ill.Dec. at 393, 529 N.E.2d at 213 cited "the availability of a tort remedy to the injured child, the possible multiplication of claims, and the difficulty of determining damages" as reasons for denying recovery in the case of negligent interference with the parent-child relationship. None of those factors really varies in its applicability just because the tortfeasor intended to disrupt the relationship of parent and child rather than negligently inflicting particularized injury on a member of that relationship. If the tortfeasor expressly tries to interfere with the relationship, a consistent application of the three *Dralle* factors should still forbid an expansion of liability. Parents and children would still have independent tort claims. Applicable theories could include such claims as false imprisonment (which Ron and Cameron have asserted), battery (if physical violence is the cause of the parent-child separation) and alienation of affections (where psychological scheming is to blame). Parents and children would still have an incentive to bring multiple claims, and damages would still be extremely hard to quantify.

Only if the Illinois Supreme Court were completely to redraw the conceptual framework applicable to such torts—by deeming the parent-child relationship to be an independent legal entity deserving protections not available to its individual members—might that court find policy reasons to reach a different outcome. But *Bullard* (on which *Kunz* relied for the proposition that the Illinois Supreme Court was willing to widen the scope of tort liability) provides little hope for the adoption of such an approach, at least in the context of nonfa-

tal injuries. Illinois cases collectively seem to elevate wrongful death into a category of its own, where recovery is more readily available than in nonfatal injury cases, and *Bullard* is only the best example of such cases.

Justice Clark wrote a concurrence in *Dralle* (124 Ill.2d at 74–81, 124 Ill.Dec. at 395–98, 529 N.E.2d at 215–18) pointing out serious flaws in the majority's reliance on those factors. That opinion strikes this Court as both cogent and persuasive, and if it were free to decide the issue from first principles it would likely adopt those views. But no other Justices joined with Justice Clark in the negligence context, and there is no more reason to count votes likely to go in that direction in the case of an intentional but nonfatal tort. Whether in purely predictive terms or in the application of what this Court has termed the *Thorpe–Garcia* doctrine (see *Rizzo,* 632 F.Supp. at 1132–33), *Dralle* and its necessary implications override any earlier different message from an intermediate appellate court.[33]

■ Whether Joshua and Amy may recover for intentional nonfatal interference with their sibling relationships also technically remains an open question (*Seef,* 145 Ill.2d at 340, 164 Ill.Dec. at 596–97, 583 N.E.2d at 512–13 (Miller, C.J., specially concurring)). But surely no policy or precedent supports the notion that siblings ought to have *broader* rights of recovery than their parents—a result that would flow against the current of all the case law in related areas. Again all the *Dralle* factors (availability of a remedy to the person directly victimized, multiple recoveries and difficulty of quantifying damages) weigh against the recognition of an expanded right to recover. Not even *Dymek*

---

the tort of intentional interference with parent-child relationships) with the opposite conclusion reached in *Larson v. Dunn,* 460 N.W.2d 39 (Minn.1990). Hence there is no point in looking elsewhere even if the purely predictive approach is taken. There is no reason to think that the Illinois Supreme Court would simply play follow the leader in the absence of a leader, or for this Court to try to determine which "leader" that court would follow if it did decide to play that game.

**33.** This Court is of course aware of *Dralle's* having left open the precise issue just decided here. But such a wise jurisprudential eschewal of dictum dealing with an issue that was not yet directly confronting the court in *Dralle* does not compel this Court to wear blinders to that case's message when this Court *is* compelled to resolve the previously-reserved issue.

and *Kunz* offer any support, either directly or by inference, for a right of recovery in siblings as opposed to parents.[34]

■ Likewise, there appears to be no Illinois Supreme Court authority on the rights of Ron and Cameron to recover for loss of parental society. One Appellate Court case (*Mueller v. Hellrung Const. Co.*, 107 Ill.App.3d 337, 63 Ill.Dec. 140, 437 N.E.2d 789 (5th Dist.1982)) denies a minor's right to recover for negligent nonfatal interference with the parent-child relationship. Under *Thorpe–Garcia* principles that is enough. And under the alternative predictive approach, once again the *Dralle* factors should control. There is no reason to believe that the state's high court would alter the *Mueller* result simply because the tortfeasor acted intentionally, or would grant children a broader right of recovery than their parents.

In sum, this Court holds that under Illinois law no cause of action exists for loss of society resulting from intentional nonfatal interference with family relationships. All of the Albers' state law claims based on violations of the right to society must be and are dismissed. That dismissal does not of course impact the Albers' claim that defendants violated their federal constitutional right to family association, for the absence of analogous state-law rights is no bar to recovery under Section 1983 (see, e.g., *Hutson*, 702 F.Supp. at 214, rejecting the argument that *Dralle* forbids Section 1983 recovery for interference with the right of family association in case of a nonfatal injury to a child)).

This has the consequence of eliminating Joshua and Amy from the case. They have already been dismissed as Section 1983 plaintiffs, and their only remaining state-law claims (false imprisonment and violations of the Mental Health and Developmental Disabilities Code) caused them no direct injury. This is not to say that Joshua and Amy did not suffer in human terms as a result of what happened to Ron and Cameron. On the contrary, it is a terrible thing to have one's family circle shattered, even if only for a few months. But Ron and Cameron were the only persons directly victimized by the alleged false imprisonment and the allegedly improper admissions and treatment. Any attempt by Joshua and Amy to ride piggyback on those claims would merely be an attempt to relabel the forbidden claim for loss of a sibling's society.

At this point it may be useful to summarize the resolution of the nonconstitutional arguments common to P & A Defendants' motions. Ron and Cameron may pursue their Section 1983 damage claims under Counts I through IV. Lynne and Herman may pursue their Section 1983 damage claims only under Counts III and IV. Joshua and Amy have no surviving claims of any kind. All Albers' claims for loss of society are dismissed, as are all their claims for declaratory relief and most of their claims for equitable relief. Because the results of addressing the nonconstitutional arguments have thus not disposed of the case in toto, it now becomes necessary to consider defendants' constitutional arguments.

## RIGHTS OF FAMILY PRIVACY AND ASSOCIATION

■ Courts have long acknowledged that the Constitution protects "a private realm of family life which the state cannot enter" (*Prince v. Massachusetts*, 321 U.S. 158, 166, 64 S.Ct. 438, 442, 88 L.Ed. 645 (1944)). Parents and children living together in traditionally recognized legal forms have historically found shelter against various forms of state intrusion. Most often

---

**34.** What has just been said could prove to be the result of gazing into a clouded crystal ball, for the Illinois Supreme Court has granted leave to appeal (141 Ill.2d 544, 162 Ill.Dec. 492, 580 N.E.2d 118 (1991)) from a decision denying siblings recovery for damages sustained from the loss of society in case of wrongful death (*Moss v. Whitaker*, 214 Ill.App.3d 89, 157 Ill.Dec. 915, 573 N.E.2d 333 (4th Dist.1991)). But even if such a right of recovery were to be recognized in a way that would imply a similar right in this case, this Court would still decline jurisdiction over that state law claim by Joshua and Amy as pendent-party plaintiffs, for reasons akin to those later expressed in this opinion as to state law claims against pendent-party defendant NHRI.

the right is described as one of the fundamental liberties protected by the substantive Due Process Clause (see, e.g., *Moore v. City of East Cleveland*, 431 U.S. 494, 499, 97 S.Ct. 1932, 1935, 52 L.Ed.2d 531 (1977) (plurality opinion by Powell, J.)), though the associational freedoms of the First Amendment are also thought to protect the integrity of families against the state (*Roberts*, 468 U.S. at 618–20, 104 S.Ct. at 3249–51).[35]

Over time the Supreme Court has specified that neither the traditional "boundary of the nuclear family" (*Moore*, 431 U.S. at 502, 97 S.Ct. at 1937 (Powell, J.)) nor the existence of blood relationships (*Smith v. Organization of Foster Families*, 431 U.S. 816, 843–44, 97 S.Ct. 2094, 2109–10, 53 L.Ed.2d 14 (1977) nor the legitimacy of a family arrangement under state law (*id.* at 845 & n. 53, 97 S.Ct. at 2110 & n. 53) defines the boundaries of family rights. Lower courts are thus free, within the limits marked out by the Court, to determine that a particular non-nuclear[36] or non-biological family merits constitutional protection. In this case Albers seek to establish that a family situated as theirs was in 1988 may stand alongside a biological family in the permanent shelter of the Constitution. Defendants maintain that the 1988 version of the Alber family was in fact some sort of quasi-family, dependent solely on the jerry-built protections of state law.

Resolution of that dispute calls first for an exploration of the guidelines suggested in *Smith*. There foster parents claimed a constitutionally protected liberty interest in their relationships with their foster children, asserting that the State of New York's procedures for removal of children from foster homes infringed upon that interest. But the Supreme Court held that New York provided an adequate degree of procedural due process whether or not the foster parents really possessed the substantive due process interest that they asserted. So the Court did not actually decide whether plaintiffs were "families" under the Constitution. Justice Brennan's opinion for the Court did discuss the considerations that would influence such a decision (*id.* at 842–47, 97 S.Ct. at 2108–2111), and that discussion has provided lower courts with a roadmap for evaluating similar claims (see, e.g., *Kyees v. County Dept. of Public Welfare of Tippecanoe County*, 600 F.2d 693, 698–99 (7th Cir.1979) (per curiam)).

*Smith* began by recognizing that a non-biological family may still for all practical purposes *be* a family. That explanation is worth quoting at length (431 U.S. at 844, 97 S.Ct. at 2109 (citation and footnotes omitted)):

> Thus the importance of the familial relationship, to the individuals involved and to the society, stems from the emotional attachments that derive from the intimacy of daily association, and from the role it plays in "promot[ing] a way of daily life" through the instruction of the children, as well as from the fact of blood relationship. No one would seriously dispute that a deeply loving and interdependent relationship between an adult and a child in his or her care may exist even in the absence of a blood relationship. At least, where a child has been placed in foster care as an infant, has never known his natural parents, and has remained continuously for several years in the care of the same foster parents, it is natural that the foster family should hold the same place in the emotional life of the foster child, and fulfill the same socializing functions, as a natural family. For this reason, we cannot dismiss the foster family as a mere collection of unrelated individuals.

*Looking for a Family Resemblance: the Limits of the Functional Approach to the Legal Definition of Family*, 104 Harv.L.Rev. 1640, 1640 & n. 1 (1991), reporting that 1988 census data show that only 27 percent of American households consist of married couples and their own minor children).

---

**35.** In the abstract it is unclear what substantive differences might exist between a family's rights under the First and the Fourteenth Amendments. In the context of the current motions no such differences appear to exist.

**36.** Pentagon-speak might instead describe the "non-nuclear" family as "conventional"—a usage both ironic and increasingly true (see Note,

Next the Court noted some essential distinctions between a foster family and a natural family that might preclude the recognition of full constitutional rights in the former. Natural families derive their liberty interest from "intrinsic human rights" that are "entirely apart from the power of the State" (*id.* at 845, 97 S.Ct. at 2110). To test the scope of the natural family's liberty interest it is therefore necessary to consider the nature of those intrinsic rights as viewed by our nation through history. Foster families, in contrast, are entirely the creatures of state law. Therefore *Smith, id.* at 845–46, 97 S.Ct. at 2110–11 (emphasis added) dictated a different method for determining the scope of their liberty interest:

> [P]articularly where, as here, the claimed interest derives from a knowingly assumed contractual relation with the State, *it is appropriate to ascertain from state law the expectations and entitlements of the parties.*

Obviously the same methodology would apply to any other sort of family relationship—such as adoption or guardianship—that owes its origins to state law rather than to blood relationship.

Finally, Justice Brennan noted that foster parents usually take children into their home on the premise that the children will ultimately return to their natural parents. Recognition of any constitutional rights in the foster parent relationship may diminish the comparable rights of the natural parents, so that the foster parent's liberty interest must be attenuated accordingly. Thus *Smith, id.* at 846, 97 S.Ct. at 2110 recognized that a foster parent case often presents a triangle of competing interests—state v. natural family v. foster family—significantly more complicated than the typical bipolar confrontation of state v. family.

It is an oversimplification—but only a little one—to view *Smith* as establishing a three-part test for application in cases such as this. First, does the putative family display the sort of "emotional attachments that derive from the intimacy of daily association," the "deeply loving and interdepen-

dent relationship[s]," that typify a natural family? Second, how does state law define the rights of the putative family? If state law makes its members more or less the equal of a natural family, then constitutional protections may be available, while if state law severely limits their rights, then they are almost certainly not a constitutional family. Third, would recognition of constitutional "family" status impinge on the rights of an existing natural family? If so, then only a very limited liberty interest may be recognized in the putative family.

In the Albers' case, a "yes" answer to the first question comes easily. For that purpose it is necessary only to look at the Complaint allegations (which, though this opinion need not now address their accuracy, appear pretty much beyond dispute).

■ For the second question, this opinion turns to Albers' "entitlements and expectations" under Illinois law. Illinois employs no single definition of "family." Instead it defines the term in many ways, according to the policy concerns at stake in a particular regulatory field. To cite but a few examples:

—Municipalities have broad discretion to define "family" for zoning purposes. They may but need not limit "family" to those related by blood, marriage or adoption (Ill.Rev.Stat. ch. 24, ¶ 11–13–1(9)). So it is that a legal "family" in Chicago might violate the zoning laws of Peoria.

—Any person who lives with a defendant with the permanent intention of remaining in residence there becomes a "family member" for purposes of accepting service of process (*A–Z Equipment Co. v. Moody*, 88 Ill.App.3d 187, 191 [43 Ill.Dec. 438, 441], 410 N.E.2d 438, 441 (1st Dist. 1980), interpreting the then Civil Practice Act § 13.2, the predecessor statute to current Ill.Rev.Stat. ch. 110, ¶ 2–203(a)(2)).

—Foster children are deemed "family members" under the Credit Union Act (Ill.Rev.Stat. ch. 17, ¶ 4402). But the Cemeteries Act limits "families" to persons related by blood or marriage (*id.* ch. 21, ¶ 64.2), while the Home Equity Assurance Act defines "family" to include

stepchildren but not foster children (*id.* ch. 24, ¶ 1603(e)).

Nor does Illinois case law employ a unitary definition of "parent." In the custody context, for instance, Illinois courts give at least some credit to the notion that a child is best placed with his or her "psychological parent"—the person who fulfills the child's emotional needs regardless of biological ties (see, e.g., *Rodriguez v. Koschny,* 57 Ill.App.3d 355, 362, 14 Ill.Dec. 916, 921, 373 N.E.2d 47, 52 (2d Dist.1978); *In re Ross,* 29 Ill.App.3d 157, 168–69, 329 N.E.2d 333, 341–42 (3d Dist.1975); similarly, see *Guardianship of Phillip B.,* 139 Cal.App.3d 407, 188 Cal.Rptr. 781 (1983) (couple who cared for Down's Syndrome child over a period of years became child's psychological parents, entitled to custody as against natural parents). Of course the case now at issue is not a custody case, and family law does not supply the rules of decision. But the cited cases reinforce the point that Illinois takes a pragmatic approach to defining the terms "family" and "parent," not the strict biological approach argued for here by P & A Defendants (see, e.g., *City of Des Plaines v. Trottner,* 34 Ill.2d 432, 216 N.E.2d 116 (1966)).

In fact, nearly a half century ago *Faber v. Industrial Comm'n,* 352 Ill. 115, 120, 185 N.E. 255, 257 (1933) unequivocally reconfirmed the even-then-long-established principle that a person who consistently and reliably acts in loco parentis acquires precisely the same rights as a natural parent, even without observing the legal formalities of adoption or guardianship:

> The doctrine that a person by admitting a child permanently into his family and treating it as a member thereof voluntarily assumes the relation to it of parent and stands in the place of a natural parent, and that the reciprocal rights, obligations, and duties of parent and child attach and continue so long as this mutually assumed relation continues, has never been repudiated by this court since its announcement in the Brush Case, over seventy-five years ago, but has been reiterated in [citing cases].

In *Faber* a woman who cared for a young man from infancy until his death at age 21 was held entitled to receive the workers' compensation benefits from his fatal accident, as his surviving "parent." More recently *Mid–American Lines, Inc. v. Industrial Comm'n,* 82 Ill.2d 47, 52, 44 Ill.Dec. 285, 287, 411 N.E.2d 254, 256 (1980) has reaffirmed the *Faber* doctrine, stating that a "putative parent" must show only that he or she "(1) intended to assume parental functions and (2) discharged parental duties."

Nor should the still-viable *Faber* principle be mistaken for a doctrine limited to the workers' compensation field. Instead it speaks in broad terms that go beyond any particular legal context (see, e.g., *Peeters v. Chicago Dist. Council of Carpenters Welfare Fund,* 97 Ill.App.3d 594, 597–98, 53 Ill.Dec. 101, 103–04, 423 N.E.2d 485, 487–88 (1st Dist.1981) (upon assumption of custody of child, but before entering into formal adoption, moral obligation to support child would arise sufficient to bring child within coverage of putative parent's health insurance); see also the cases cited with approval in *Mid–American,* 82 Ill.2d at 52, 44 Ill.Dec. at 287, 411 N.E.2d at 256, dealing with issues including parental tort immunity (*Lyles v. Jackson,* 216 Va. 797, 223 S.E.2d 873, 874 (1976) (per curiam)), availability of welfare benefits (*In re Fowler,* 130 Vt. 176, 288 A.2d 463, 466 (1972)) and the visitation rights of a former stepparent (*Gribble v. Gribble,* 583 P.2d 64, 67 (Utah 1978), finding that a stepparent who had acted in loco parentis acquired due process right under Utah constitution to a hearing on visitation rights).

Albers clearly satisfy the broad terms of *Faber.* They took Ron and Cameron into their home and treated them as members of the family for more than 13 years. *Mid–American* merely reformulates *Faber* as a two-part test, which Albers again pass easily: They intended to assume the parental role, and they actually discharged parental functions. In those terms Lynne and Herman certainly seem to have become "parents," and Albers a "family," under Illinois law and therefore (by extension via *Smith*) under the federal Constitution.

Yet to halt the inquiry here would be premature. Rather than beginning and ending with the highly general countours of the *Faber* doctrine, it is best to look more specifically at the shifts in Albers' legal status over time. We need to know whether classification as a *Faber* "family" would clash with some more specific legal classification that could be applicable to Albers at the relevant times.

■■■ Lynne and Herman met Ron and Cameron when the latter were small boys living at the Dixon Developmental Center. Nothing in the Complaint tells us how Ron and Cameron came to live at Dixon or what legal status they held when they lived there. They came to live in the Alber home in the mid–1970s. Presumably some sort of legal procedures were followed at the time—it would be the height of irresponsibility for Illinois to make handshake agreements for the care of retarded children. But Albers have alleged no particular legal basis for those placements. This Court therefore has no basis for forming an inference as to what legal relationship arose among Albers in 1974 and 1975.

Speculation on that score is unnecessary, however, because Lynne and Herman did become legal guardians to Ron and Cameron in 1983—well before the events that gave rise to this case.[37] Again no particular legal basis is alleged for the creation of the guardian-ward relationship, but Illinois statutes provide at least two mechanisms that might have been used: Article XI of the Probate Code (Ill.Rev.Stat. ch. 110½, ¶¶ 11–1 to 11–17) and the Juvenile Court Act (*id.* ch. 37, ¶¶ 801–807). Of those two the former seems the more likely candidate: It provides generally for the appointment of minor guardians, while the Juvenile Court Act provides for guardianship only in circumstances of abuse, neglect or dependency—none of which, as defined in the statute, seems to describe the condition of Ron and Cameron in 1983.

Those guardianships continued in force until the eighteenth birthdays of Ron and Cameron in 1985 and 1986, respectively.

Once the guardianships formally lapsed, nothing really changed for Ron and Cameron during the two and three years (again respectively) that elapsed until Michael Richardson took them away. They continued to live in the Alber home, and Lynne and Herman continued to act in loco parentis, both toward them and on their behalf with others. Neither the state authorities nor the natural parents made any move to displace Lynne and Herman.

In fact the reasonable inference from the Complaint is that Cameron's parents completely supported the assertion of parental authority by Lynne and Herman, else they would not have participated later on in what was clearly a joint effort with Lynne and Herman to return Cameron from Village Inn to the Alber home. As for Ron, there is no suggestion that his natural parents have ever played any role or expressed any interest in his care.

Still, after the minor guardianship lapsed Lynne and Herman did not adopt Ron and Cameron. Nor did they have Ron and Cameron adjudicated as "disabled adults" under Article XIa of the Probate Code (Ill. Rev.Stat. ch. 110½, ¶ 11a). That statute provides for the appointment of guardians for persons over 18 who meet traditional legal definitions of incompetency, specifically defined to include persons with developmental disabilities like those that afflict Ron and Cameron (*id.* ¶¶ 11a–1, 11a–2).

Illinois adopted the "disabled adult" classification in 1979, evidently intending that it serve as a sort of steppingstone for handicapped adults previously subject to minor guardianship. By law, six months before a developmentally disabled person in Department's care reaches the age of majority (age 18) Department must take steps to begin disabled-adult guardianship proceedings where appropriate (Ill.Rev.Stat. ch. 91½, ¶ 4–207). Perhaps Albers did not constitute the sort of persons requiring notification under that statute, and perhaps they received notification but failed to act on it—the Complaint is silent on that score. In any event, they let the minor guardian-

---

**37.** In light of that appointment, defendants' repeated emphasis on prior cases involving foster care (see, e.g., P & A R. Mem. 3–4) seems completely misplaced.

ships lapse without establishing formal legal relationships in their stead.

Ron and Cameron therefore appear to have dwelt in a sort of legal limbo. Technically they were emancipated adults. In reality they lacked the legal and practical capacity to live independently, as they always have and always will. Obviously they were doing more than "merely retaining a residence in the Alber's [sic] house" (P & A R. Mem. 2). Lynne and Herman continued to accept all the responsibilities of parenthood, and they were regarded as persons in loco parentis by authorities such as Union Grove School. Ron and Cameron had no place else to go. It seems likely that if Lynne and Herman had simply thrown them out or had failed to care for them properly, Lynne and Herman would (and should) have been subject to an abuse or neglect action (cf. *Strom v. Strom*, 13 Ill.App.2d 354, 142 N.E.2d 172 (1st Dist. 1957), holding that parents of disabled child may be compelled to support the child beyond the age of majority). Indeed, the very fact that a neglect investigation *was* conducted suggests that the world continued to deal with Lynne and Herman, and rightly so, as if they were the only real "parents" that Ron and Cameron had.

P & A Defendants insist that Albers cannot be a family because the guardianships had lapsed, converting Ron and Cameron into legal adults—an assertion that is "true" only in the most hypertechnical sense, as already noted, and that reflects a sort of callousness ill-suited to P & A and its functions. In response Albers argue only that their relationship "continued to endure" during this period (Alber Mem. 8 [38]). That is a Hallmark card, not a legal argument. Albers make no reference to the *Faber* line of cases there or anywhere else in their briefs, and they do not address the essential issue of whether a *Faber* family can exist when the putative parents once enjoyed a formal relationship with the children but let the relationship lapse.

Neither side has made mention of a common-law doctrine that seems tailor-made for this situation: guardianship by estoppel. Guardianship, though essentially a creature of statute, is not exclusively so. Adults often undertake to provide for the care of minors or incompetents as a legal guardian would do—as Lynne and Herman in fact did do—without going through a statutory guardianship proceeding. Perhaps they want to be good Samaritans, perhaps they have the ignoble purpose of looting the estate of a deceased relative.[39] No matter the motive, in such situations courts have traditionally declared that the adults become guardians by estoppel (see generally *National Security Fire & Casualty Co. v. Brannon*, 52 Ala.App. 576, 296 So.2d 170, 173 (1974)).

Such a declaration creates a fiduciary relationship retroactive to the time the adult first began to act as a guardian. Thus it imposes a constructive trust in those cases where the adult has misused the ward's assets (*Miske v. Habay*, 1 N.J. 368, 63 A.2d 883 (1949)). More generally, a guardian by estoppel assumes all the same duties as a guardian de jure (*Trook v. Lafayette Bank & Trust Co.*, 581 N.E.2d 941, 947–48 (Ind.App.2d Dist.1991)) and thus logically receives the benefits as well as the liabilities of that status (*id.; Pemberton v. Leatherwood*, 218 S.W.2d 500, 506 (Tex.Civ.App.1949)). In short, the minor or incompetent is thus guaranteed that the adult who has acted as his or her guardian is required to continue doing so, and to do so in good faith, while the adult enjoys a corresponding degree of protection from the vagaries of state action because he or she is no longer a legal stranger to the ward.

While the Illinois Supreme Court has never endorsed the doctrine of guardianship by estoppel by that name, it has twice

---

**38.** Albers have filed four memoranda in this case, one in response to each motion to dismiss. This opinion generally cites each of them as "Alber Mem." It should always be clear from the context which of the memoranda is being cited.

**39.** Hence the law-French title for the doctrine of "guardian *de son tort*," or "guardian by his own wrong".

mentioned the doctrine, seeming to recognize it as generally accepted (*In re Orr*, 38 Ill.2d 417, 419, 231 N.E.2d 424, 425 (1967) (en passant) and *Cheney v. Roodhouse*, 135 Ill. 257, 266, 25 N.E. 1019, 1021 (1890)). More importantly, guardianship by estoppel and the *Faber* "putative parent" doctrine seem to represent virtually identical concepts clothed in different language. Thus the only reasonable conclusion is· that if confronted with the same case the Illinois Supreme Court would declare Lynne and Herman guardians by estoppel if not full legal parents (even assuming for the moment that the distinction has some legal significance).

All the circumstances that justified the initial guardianship appointment apparently remained in place when the guardianship lapsed. Lynne and Herman continued to act as guardians in fact, and Ron and Cameron continued to enjoy the benefits of their protection. To declare Lynne and Herman guardians by estoppel would merely align Illinois with the many other jurisdictions that recognize that doctrine as an effective way to back-and-fill—to define a legal relationship where it is obvious that the relationship existed as a matter of fact, and where the parties require the protection of a declaration that it also existed as a matter of law. If an Illinois court were *not* to declare Lynne and Herman guardians by estoppel, it would in effect endorse the absurd notion that Ron and Cameron really were emancipated adults to whom the adult Albers bore no responsibilities.

Two possible arguments against the doctrine do come to mind. Neither is at all persuasive, however.[40]

First, it might be argued that the doctrine undercuts the Illinois statutory scheme. By requiring a separate adjudication of disability at age 18, the Probate Code provides procedural safeguards for the liberty of disabled young adults who might prefer to live independently and might be able to do so. Recognition of the

concept of guardianship by estoppel might be suggested as a temptation to the guardians of disabled minors to ignore the provisions for asserting guardianship of disabled adults, as a means of maintaining control over their wards. But that eventuality seems remote, certainly so in light of the statutory provision that Department is required to set in motion the adult guardianship proceedings. In any event and more importantly, the facts of this case certainly do not justify rejection of the doctrine on that basis. Ron and Cameron had no prospects for independent living and apparently welcomed their return to the Alber home.

Second, it might be argued that the availability of any form of common-law guardianship will generally diminish the incentive to seek proper statutory guardianship. No doubt the Illinois legislature, by creating the statutory scheme that it did, meant to express a powerful preference for statutory forms of guardianship. But the legislature did not express an exclusive preference, and there is no reason to think that the recognition of guardianship by estoppel would seriously undercut the statutory system. There will always be powerful incentives to observe legal formalities in the guardianship context. Surely a judicial appointment will always provide would-be guardians with greater certainty than an ex post recognition of guardianship by estoppel. Indeed, the sequence of events in this case should serve as the strongest imaginable disincentive to any would-be guardian who thinks it easier to ignore legal formalities.

In the end it must be recognized that guardianship by estoppel has coexisted successfully alongside statutory schemes in other jurisdictions, filling the limited niche already described. Certainly the doctrine can do the same in Illinois. This Court therefore concludes that the doctrine of guardianship by estoppel applies in Illinois,

---

**40.** It need hardly be said that the process at work in this section of this opinion is inherently troublesome—one in which, because of the parties' defaults in having done their own jobs as advocates, this Court is compelled on its own to identify both the relevant principles for deciding the issues and then the potential objections to those principles, and only then to resolve the conflicts between the two positions.

that Lynne and Herman were the guardians by estoppel of Ron and Cameron from the time that the minor guardianship lapsed, and that as such they retained their rights as the minor guardians of Ron and Cameron.

So the question becomes whether as such guardians Lynne and Herman could invoke the constitutional protections available to natural parents. In two of the Supreme Court's seminal cases on the right of family association (*Pierce v. Society of Sisters*, 268 U.S. 510, 45 S.Ct. 571, 69 L.Ed. 1070 (1925) and *Prince v. Massachusetts*, 321 U.S. 158, 64 S.Ct. 438, 88 L.Ed. 645 (1944)) the plaintiffs included guardians as well as natural parents. That distinction appears not to have bothered the Court: It explicitly stated that the state may not interfere with "the liberty of parents *and guardians* to direct the upbringing and education of children under their control" (*Pierce*, 268 U.S. at 534–35, 45 S.Ct. at 573–74 (emphasis added)).

*Pierce* does not hold that every "guardian" is a legal "parent." There are many different forms of guardianship (see Black's Law Dictionary ("Black's") 706–07 (6th ed. 1990)), each defined differently under state law. *Pierce* thus must be read alongside *Smith*. Where state law limits guardianship rights so severely that it becomes unreasonable to equate a parent with a guardian, then a guardian may not be able to claim a constitutional liberty interest in his or her relationship with the ward. Where a state treats parent and guardian as legal equals, then guardian and ward may claim constitutional rights of family association.

Again this Court is put into the position of deciding what might in surface terms be perceived as a novel question of Illinois law. No Illinois case or statute explicitly decrees that a minor guardian is the legal equivalent of a parent. Nor does any case or statute explicitly state the opposite. But a review of the relevant sources of Illinois law demonstrates that the question is not really so novel. For Illinois does indeed treat a minor's guardian as the legal

equivalent of a parent, even if no case or statute makes the point in so many words.

Technically the person and estate of the ward are under the control of the Illinois Circuit Court (Ill.Rev.Stat. ch. 110½, ¶ 11–13). That control is for the most part a formality, the equivalent of retaining jurisdiction to enforce an earlier order—in this case the appointment of a guardian who must perform certain duties or lose the appointment. In practical terms, the Probate Code assigns to the guardian all the day-to-day duties that a natural parent ordinarily performs (*id.* ¶ 11–13(a) and (b)):

(a) The guardian of the person shall have the custody, nurture and tuition and shall provide education of the ward....

(b) The guardian ... shall have the care, management and investment of the estate, shall manage the estate frugally and shall apply the income and principal of the estate so far as necessary for the comfort and suitable support and education of the ward....

That statute thus creates a *general* guardianship, with broad control over both person and estate, as opposed to a *special* guardianship with particular and proscribed responsibilities, such as a guardianship ad litem (Black's at 706).

Guardianship of a minor under the Juvenile Court Act carries similarly broad powers (see the Act's statement of purpose and policy in Ill.Rev.Stat. ch. 37, ¶ 801–2). Early last month a computerized search of the Illinois statutes revealed nearly 300 instances in which the legislature has made particular legal standards equally applicable to "parent or guardian" (LEXIS search, CODES library, ILCODE file, Feb. 6, 1992). And other courts interpreting guardianship statutes comparable to those in Illinois have explicitly held guardianship to be the legal equivalent of parenthood (*Griffith v. Johnston*, 899 F.2d 1427, 1440 (5th Cir. 1990) (Texas law); *In re Jamie G.*, 196 Cal.App.3d 675, 241 Cal.Rptr. 869, 872 (1987); *Sandine v. Johnson*, 188 Iowa 620, 176 N.W. 638 (1920)).

All of those factors collectively compel the conclusion that for all purposes relevant to this case a minor's guardian is the

legal equivalent of a parent under Illinois law. And that is really no more than common sense—after all, the whole point of naming a minor guardian is to ensure that somebody is empowered to act in loco parentis, so as to avoid a vacuum in authority over the minor that could be confusing and injurious to all concerned.

Other cases may demonstrate certain ways in which such a guardian's rights are more limited than a parent's. But no such conceivable inhibiting factor seems relevant to the case at hand. Lynne and Herman, as guardians to Ron and Cameron at the time that as minors they were first removed from the Alber home, were the legal equivalent of parents. That being so, they and their wards were entitled to the same constitutional protections as the members of a natural family.

Thus the designation of guardianship by estoppel really just returns full circle to the *Faber* doctrine of de facto parenthood. While this Court regards the guardianship label as more appropriate to the Albers, the result is the same as if this Court had simply relied on the better-established Illinois doctrine of putative parenthood. And on the facts of this case, such reliance plainly would be not only permissible but demanded.

Now to the question of Albers' legal status at the time of the second removal and confinement. Cameron's natural parents became his de jure guardians in June of 1988, and Lynne and Herman became Ron's de jure guardians in July 1988. Those appointments were made under the statutory provisions for guardianship of disabled adults referred to earlier.

For that purpose the Probate Code requires first an adjudication of disability, then the appointment of a guardian whose powers and responsibilities may only be as broad as "necessitated by the individual's actual mental, physical and adaptive limitations" (Ill.Rev.Stat. ch. 110½, ¶ 11a–3(b)). If the person "lack[s] some but not all of the capacity as specified in Section 11a–3,"

then the court "shall appoint a limited guardian of the ... person or estate or both" (*id.* ¶ 11a–12(c)). If a person is "totally without [such] capacity," then the court "shall appoint a plenary guardian for the ... person or estate or both" (*id.* ¶ 11a–12(b)).

Cameron's parents were named plenary guardians of his estate and person (¶ 9). Lynne and Herman were granted similar status as to Ron (¶ 13). Determination of the scope of a plenary guardian's authority requires reference to the statutory definitions of the duties of both a personal guardian (Ill.Rev.Stat. ch. 110½, ¶ 11a–17) and an estate guardian (*id.* ¶ 11a–18). Those two definitions, when stitched together, track almost word for word the already-quoted definition of the duties of a minor's guardian under the Probate Code (*id.* ¶ 11–13(a) and (b)). Hence the statute must be construed to mean that plenary guardianship for a disabled adult creates the same constitutional right to family association as does minor guardianship (cf. *Buchholz's Appeal from Probate*, 9 Conn. App. 413, 519 A.2d 615, 619–20 (1987) (parent of a mentally retarded adult should have same legal rights and status as parent of a minor)).[41]

Lynne, Herman and Ron therefore formed a "family" within the meaning of the Constitution at the time that Department took Ron from the Alber home and placed him at Lincoln. Cameron's case is a bit more complicated. His natural parents, and not Lynne and Herman, were his legal guardians at the same point in time. Cameron may have been living in the Alber home, but Lynne and Herman did not become his plenary guardians until March 1989, well after the events underlying this case.

It appears from the Complaint's allegations, however, that Cameron's natural parents sought the guardianship only for the express purpose of returning Cameron from Village Inn to the care of Lynne and Herman. Were that not so, the natural

---

**41.** That conclusion might not necessarily apply in the case of a much older disabled person or one who has never lived with the guardian as a family member—i.e., a case where even the first of the *Smith* requirements is not at all met. But that is not this case.

parents would not have taken him from Village Inn right back to the Alber home. It is therefore reasonable, in testing the Complaint's legal sufficiency, to infer that the Probate Court approved ex ante the notion that Cameron's natural parents would effectively assign their guardianship rights and duties to Lynne and Herman—in effect renewing the relationship of guardianship by estoppel that Lynne and Herman had formerly enjoyed with Cameron.

Under those circumstances it would be absurd to deny Albers the same rights as to Cameron that they enjoyed as to Ron. Therefore this Court holds that a right of family association existed as among Lynne, Herman, Ron *and* Cameron at the time of the second seizure and confinement, as well as when the first occurred.

Just as the first *Smith* factor—intimacy of daily association and the like—cuts in Albers' favor, so too then does the second factor of state-law rights and entitlements. All that is left is the third factor, the rights of the natural parents. If the natural parents had any interest in maintaining their parental rights, it would of course be extremely problematic to recognize anything but a "substantially attenuated" liberty interest in Lynne's and Herman's relationship with Ron and Cameron (*Smith*, 431 U.S. at 847, 97 S.Ct. at 2111).

But that "issue" is truly a nonissue. Nothing alleged in the Complaint even suggests that Ron's or Cameron's natural parents wanted them to live anywhere but in the Alber home. All that can fairly be inferred from the Complaint is that Cameron's parents sought guardianship rights solely to restore the status quo that existed before Michael Richardson took Cameron to Village Inn: the de facto family relationship among Cameron, Ron and the other Albers. There is no need to speculate as to why Cameron's parents sought the guardianship rather than Lynne and Herman. That might have been done because the parents thought the judge would prefer to appoint natural parents as guardians if possible—not because their interests were in any way inconsistent with Lynne's and Herman's. What controls, however, is

what they *did* immediately after the court order, not what they may have thought. And as for Ron's parents, the Complaint contains no hint that they remained involved in his life at all after he first went to live at Dixon Developmental Center. Thus it is safe to conclude that this case presents a bipolar dispute between the State and Albers, not the sort of triangular dispute that was posited by Justice Brennan in *Smith*.

In sum, all three elements of the *Smith* analysis support Albers' claim that they were a constitutional "family" at all times relevant to this case. This Court therefore holds that Albers did form a family under the Constitution. Lynne, Herman, Ron and Cameron have stated a constitutional claim under the First and Fourteenth Amendments. Hence the P & A and Michael Richardson motion to dismiss on constitutional grounds is denied.

### 2. *Naiditch*

 As already noted, Naiditch makes all the same arguments dealt with above as do P & A and Michael Richardson, plus one unique argument: that she was not timely served as required by Rule 4(j). Accordingly she seeks dismissal from the action pursuant to Rule 12(b)(5).

> Rule 4(j) states in relevant part:
> If a service of the summons and complaint is not made upon a defendant within 120 days after the filing of the complaint and the party on whose behalf such service was required cannot show good cause why such service was not made within that period, the action shall be dismissed as to that defendant without prejudice upon the court's own initiative or on motion.

Yet another review of the procedural history of the case—but with added facts—is needed to decide whether Albers met that standard. Because no facts are in dispute, the Rule 12(b)(5) motion poses a pure issue of law.

Albers filed their state-court complaint on June 28, 1990. For nearly three months the Circuit Court of Cook County apparently sat on Albers' accompanying application

to proceed as "poor persons" under the Illinois Code of Civil Procedure (Ill.Rev. Stat. ch. 110, ¶ 5-105). Then Judge Yates of that court granted that application on September 25, 1990 (Alber Mem. Ex. A), entitling Albers under the same statute to have the Cook County Sheriff execute service of process on all defendants at no charge to them. On October 15, 1990 the sheriff first attempted to serve Naiditch (*id.* Ex. B). She was not served then because the sheriff went to P & A's old address, from which it had moved the month before (*id.*).

Defendants removed the case to this District Court on November 9, 1990. Albers' status as in forma pauperis plaintiffs in the state system did not automatically carry over. They had to make separate applications under the federal pauper statute (28 U.S.C. § 1915) and did so on November 19, 1990. Judge Bua did not act on the applications before he remanded the case to state court on November 28. Following the remand order the Sheriff's Office attempted three more times to serve Naiditch: on November 30, December 5 and December 7, 1990 (Alber Mem. Ex. C). None of the efforts succeeded.

Judge Bua then vacated his remand order and (as already discussed) reasserted jurisdiction over the case on January 2, 1991. On February 20 Judge Bua granted Albers leave to proceed in forma pauperis. Just as the earlier order by Judge Yates had entitled Albers to have the Sheriff serve defendants, Judge Bua's order entitled—indeed required—Albers to use the United States Marshals Service for that purpose: 28 U.S.C. § 1915(c) (emphasis added) states that "officers of the court *shall* issue and serve all process" on behalf of an in forma pauperis plaintiff. On March 11 the Marshals Service attempted service on Naiditch by mail. On March 27 Naiditch signed the Marshals Service form acknowledging receipt of service (Naiditch Mem. Ex. A).

If the Rule 4(j) 120-day clock had expired by March 27, Naiditch's dismissal would be mandatory unless Albers could show good cause for their failure to obtain timely service on her (*Geiger v. Allen,* 850 F.2d 330, 331-32 (7th Cir.1988)). For that purpose it must be decided whether to date the beginning of the 120-day period from the state-court filing or from the date of removal or some other date.

Only two cases deal directly with the issue as between the filing and removal dates, and both conclude that time runs only from the latter (*Bruley v. Lincoln Property Co.,* 140 F.R.D. 452, 454-455, (D.Colo.1991); *Motsinger v. Flynt,* 119 F.R.D. 373, 377 (M.D.N.C.1988)). This Court agrees with the analysis and result of both cases. No federal interest in a case arises until the date of removal, and there is no reason why federal procedural rules should be thought to apply until such an interest arises. Nor is there any reason why the federal rules should apply retroactively to the date of the state-court filing. Substantial prejudice could result from such application, especially in jurisdictions like Illinois that impose no comparable time limit on service of process. For example, a defendant in a state-court case subject to removal could wait until 120 days had run, remove the case and then have it dismissed immediately for untimely service of process.

So in this case the clock potentially began to run only on November 9, 1990, the date on which defendants filed their notice of removal. True enough, more than 120 days elapsed between that date and March 27, but that is not the end of the inquiry. Where the parties are paying their own way through the legal system, the 120-day clock runs inexorably from the filing of the complaint, or in a removed case from the date of filing of the notice of removal. Rule 4(j) plainly says as much. But Albers could not pay their way—that is why both the Illinois and federal courts granted them leave to proceed in forma pauperis.

Rule 4(j) must be read in conjunction with the in forma pauperis statute. In a case that originates in the federal courts, until the application to proceed in forma pauperis is acted upon there is really no pending action in which process may be served to begin with—leave has not been

granted to file the action.[42] Read together, then, Rule 4(j) and Section 1915(a) call for the 120–day clock to begin to run only after the district judge has ruled favorably on the application to proceed in forma pauperis (*Robinson v. America's Best Contacts & Eyeglasses*, 876 F.2d 596, 598 (7th Cir. 1989)) so that the plaintiff becomes entitled to have the United States Marshals serve the defendant. In this instance (because the case originated elsewhere and was then removed to this District Court), the 28 U.S.C. § 1915 motion and ruling necessarily had to take place after the removal. Judge Bua granted the motion to proceed in forma pauperis on February 20, 1991 and Naiditch was served on March 27—the 35th day thereafter.[43] Albers were entitled to 120 days, which extended far beyond that time frame.

Maybe the days that elapsed between the filing of the notice of removal and Albers' filing of their application to proceed in forma pauperis could also be counted against the clock. But in removal cases (as contrasted with cases originally filed in federal court, where all initiating documents ought to be prepared in advance of filing) plaintiffs must be allowed a reasonable time to prepare the application following receipt of the removal notice. Perhaps if plaintiff were to file the application well after the removal in an obvious attempt to toll the Rule 4(j) clock, the elapsed time should also be counted against the 120–day total. Here, though, only 10 days elapsed between the date of removal and the in forma pauperis application. And all this hypothetical discussion is beside the mark anyway, because Naiditch was still timely served even if the 10 days were to be added to the 37 days.

Naiditch's motion to dismiss under Rule 12(b)(5) is denied. As for her arguments under Rule 12(b)(6), her motion is either granted or denied to the same extent as already described in the section headed "P & A Defendants."

### 3. NHI Defendants [44]

Albers assert that NHI is liable for the confinement of Ron and Cameron at Village Inn because NHI owned and operated the facility. NHI and its former chairman Osborn have moved to dismiss under Rule 12(b)(6), or in the alternative for summary judgment under Rule 56. They raise many arguments, some of which track those made by P & A Defendants and would be governed by the earlier analysis. But only one separate argument requires consideration here.

NHI and Osborn claim that they are not proper party defendants because NHI never owned or operated Village Inn. Because resolution of that issue requires consideration of disputed facts, this opinion will treat the motion as one for summary judgment, and must therefore apply Rule 56 standards.[45]

---

**42.** Once such leave is granted, however, the law treats the filing as having taken place (for statute of limitations purposes) when the complaint was first tendered—see Rule 3.

**43.** Approximately 80 days had elapsed during which Albers were entitled to have the Cook County Sheriff serve Naiditch: from September 25, 1990 (when Judge Yates issued his order) until November 9 (when defendants removed the case), and then again from November 28 (when Judge Bua remanded the case) until January 2, 1991 (when he reasserted jurisdiction). If those days were also counted against the 120–day limit, then this would be a closer call. But the Rule 4(j) clock can only run when federal jurisdiction exists. Any days when Judge Yates' order was in operation cannot count, because the case was then in state court.

**44.** It bears repeating that Martinez Monaco—allegedly the director of Village Inn, and a fellow defendant in Count II along with NHI and Osborn—has not filed a single piece of paper in this action. She is not a party to the motion to dismiss and this opinion therefore does not apply to her, though of course it might later be determined to have some issue-preclusive effect.

**45.** Rule 56 requires this Court to rule in a movant's favor if "there is no genuine issue as to any material fact and … the moving party is entitled to a judgment as a matter of law." To demonstrate that an issue is genuine the responding party must cite to some evidence in the record sufficient to suggest that its view of the issue might be adopted by a reasonable jury (*Anderson v. Liberty Lobby*, 477 U.S. 242, 249, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986); *Billups v. Methodist Hosp. of Chicago*, 922 F.2d 1300, 1304 (7th Cir.1991)). To demonstrate that an issue is material the responding party must show that the issue is outcome-determinative

No corporation, whether private or municipal, may be held accountable under Section 1983 on a respondeat superior theory, unless the corporation's own policy or custom directly prompted the employees' tortious acts (*Iskander v. Village of Forest Park*, 690 F.2d 126, 128 (7th Cir.1982)). Even more fundamentally, a private corporation cannot be held liable for the torts of people who are not really its employees or agents. So the issue here is whether NHI and Osborn employed or directed the employees at Village Inn who were responsible for the admission and care of Ron and Cameron.

NHI and Osborn wholly disclaim any involvement with the ownership or management of Village Inn generally, or with the admission and care of Ron and Cameron in particular. They have tendered six exhibits:

—two affidavits by Osborn that support in detail the claim that neither he nor NHI was involved with Village Inn or with Ron and Cameron in any way bearing on the facts of this case (NHI Mem. Ex. D and NHI R. Mem. Ex. B);

—two affidavits to similar effect by Joseph Rzepka, NHI's vice president and its chief financial officer (NHI Mem. Ex. B and NHI R. Mem. Ex. A);

—a certificate from the Illinois Secretary of State, indicating that NHI's certificate of authority to do business in Illinois was revoked on September 1, 1987 (NHI Mem. Ex. A); and

—a letter and computer printout from DPH, indicating that *NHRI* and not NHI is the operator and licensee of Village Inn (NHI Mem. Ex. C).

Those exhibits coherently and consistently illustrate the claim that NHI and Osborn had no relationship with Village Inn that might trigger liability in this case. Most telling are the specific denials of any involvement in the hiring of Village Inn's administrator or staff or in the establishment of its operational policies and procedures (see, e.g., Osborn Aff. ¶ 4; Rzepka Supp. Aff. ¶ 8).

Albers have tendered one exhibit to the contrary (Alber Mem. Ex. A). It consists of two identical form letters on NHI's letterhead, one addressed to Ron and the other to Cameron, each dated June 1, 1988 and bearing a facsimile of Osborn's signature.[46] In each letter "Osborn" thanks the addressee "for entrusting your loved one to our health care center," meaning Village Inn, and asks that the addressee complete a survey that will help NHI "develop our plan for the coming year" and "provide our residents with the best in quality health care."

By that repeated use of the first person plural, the form letter might prompt the inference that Village Inn is in some sense an NHI facility or subsidiary, as well as the inference that Osborn took personal responsibility for the care provided there. But the NHI exhibits completely rebut any such inference. From Rzepka's Supp. Aff. ¶ 5 we learn that NHI:

> provides marketing services to [NHRI] including the tabulation of census and consumer data. The Marketing Letters [to Ron and Cameron] were designed to obtain census and consumer satisfaction data and nothing more. Any such data received by NHI was used by NHI solely to calculate census figures and develop a generic marketing plan.

From Osborn's Supp. Aff. ¶ 6 we learn that the letters were prepared and sent by NHI's public relations department without Osborn's knowledge or consent. In addition, the documents from the Secretary of State and DPH corroborate the contentions made in the Rzepka and Osborn affidavits

---

under the applicable substantive law (*Pritchard v. Rainfair, Inc.*, 945 F.2d 185, 191 (7th Cir. 1991)). In the first instance, however, Rule 56 assigns to movants NHI and Osborn the burden of establishing the lack of a genuine issue of material fact (*Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986)). And this Court must resolve all factual disputes and draw all "reasonable infer-

ences, but not every conceivable inference" in favor of Albers as the nonmoving parties (*De Valk Lincoln Mercury, Inc. v. Ford Motor Co.*, 811 F.2d 326, 329 (7th Cir.1987)).

**46.** NHI argues that the letters are inadmissible hearsay, but this opinion need not reach that contention.

that NHI did not own or operate Village Inn at the relevant time (if indeed it ever did).

Finally, a brief trip beyond the scope of the motion now under consideration—figuratively speaking, a walk next door to the motion filed by NHRI—confirms the veracity of the NHI–Osborn assertions. NHRI appears to admit that *it* was the operator and licensee of Village Inn in 1988, as the DPH computer printout suggests. It does not claim to be an improper party defendant.

In short, all that links NHI Defendants to this case are some form letters sent out by the marketing department of NHI, the folksy language of which gave Albers the incorrect impression that NHI and not NHRI was the corporate entity responsible for the operation of Village Inn. Jurisdiction over NHI and Osborn must be based on facts, not on the plaintiffs' subjective impressions. Albers have not tendered any evidence that suggests they could persuade a reasonable trier of fact that NHI or Osborn is a proper party.

If this had been framed solely as a full-fledged Rule 56 proceeding, the parties would have been required to submit competing factual statements under this District Court's General Rule 12(m) and 12(n). Here this Court's factual information is derived instead from evidence initially tendered as attachments to the briefs on a motion to dismiss. NHI Defendants did not suggest the alternative of summary judgment until the concluding paragraph of their reply memorandum. But the factual issues are obvious, nonmovants Albers have had and have exercised the opportunity to tender their own evidence, and there is no reason to think that during discovery they would unearth evidence to support a contrary conclusion.

Of course, Albers may file a motion to reconsider if in good conscience they consider themselves to have been prejudiced by the use of this somewhat truncated summary judgment procedure. To drop the formalities for a moment, however, it seems plain that what happened here is that Albers did not know whether to shoot at NHI or NHRI, so they understandably took the buckshot approach and blasted both. Now it appears clear that, as between the two, NHRI was the proper target.[47] Unless Albers have some objective good-faith basis for disputing that conclusion, they should not target NHI again.

There is no genuine issue of material fact, and NHI Defendants are entitled to a judgment as a matter of law. This Court orders NHI Defendants dismissed as parties to this action.

### 4. *NHRI*[48]

NHRI, the operator and licensee of Village Inn, has moved to dismiss Count II, the only count in which it is named. Once again this Court is offered a veritable buffet of legal arguments from which to choose. And once again some non-merits arguments require initial consideration.

### IS NHRI A NAMED DEFENDANT?

■ NHRI first argues that it should be dismissed out because Albers have drafted their Complaint so sloppily that NHRI is not really named as a defendant (NHRI Mem. 4, ¶ 4). Admittedly it takes some work to figure out just whom Albers are charging. Heaven knows why they first chose "National" as the short form for both NHI and NHRI (¶¶ 25, 28), then went on to describe NHRI as "National Realty" in subsequent references (see, e.g., ¶¶ 89, 90), then concluded by seeking relief from "National" but not from "National Realty" (¶ 154).

That kind of pleading provides grounds for frustration and wonderment, however, and not dismissal. It is clear enough that any reference to "National" was meant to encompass both NHI and NHRI. Hence it

---

**47.** This characterization of course is not a substantive ruling on the arguments raised in NHRI's own motion to dismiss.

**48.** Everything said about Martinez Monaco (see n. 44) is also true of Guttmann, who is a named defendant and allegedly an NHRI employee assigned to Village Inn, and who has filed nothing at all in this case.

is clear enough that Count II advances a claim against the two companies either in the alternative or jointly and severally.

### RULE 15(c)

■ Next NHRI argues that the lawsuit is time-barred under Rule 15(c). Albers added NHRI as a party defendant in their Amended Complaint filed March 11, 1991, well over two years after any of Albers' causes of action accrued and nearly nine months after the filing of the state-court complaint. *Schiavone v. Fortune,* 477 U.S. 21, 29, 106 S.Ct. 2379, 2384, 91 L.Ed.2d 18 (1986) teaches that under the version of Rule 15(c) that applies to this case,[49] four factors must be present before the addition of a new party defendant will relate back to the date of the original pleading:

> (1) the basic claim must have arisen out of the conduct set forth in the original pleading; (2) the party to be brought in must have received such notice that it will not be prejudiced in maintaining its defense; (3) that party must or should have known that, but for a mistake concerning identity, the action would have been brought against it; and (4) the second and third requirements must have been fulfilled within the prescribed limitations period.

Added the Court, *id.* at 31, 106 S.Ct. at 2385:

> The linchpin is notice, and notice within the limitations period.

NHRI claims it received no such notice.

Even assuming that NHRI received no actual notice, it is hard to decide whether Rule 15(c) mandates dismissal. As *Schiavone, id.* at 29, 106 S.Ct. at 2384 put it:

> Timely filing of a complaint, and notice within the limitations period to the party named in the complaint, permit imputa-

tion of notice to a subsequently named and sufficiently related party.

This Court lacks the factual record necessary to decide whether NHRI was "sufficiently related" to NHI to permit imputation of notice. But as the following discussion demonstrates, Rule 15(c) would not justify dismissal of NHRI no matter what their relationship may be.

Only Ron and Cameron remain as plaintiffs in Count II. This opinion has earlier dismissed Joshua's and Amy's Section 1983 claims for lack of standing, dismissed all of Lynne's and Herman's Count II claims as time-barred and dismissed all Albers' common-law claims for loss of society. That leaves potentially surviving against NHRI only the Section 1983 claims of Ron and Cameron, their common-law claims for wrongful confinement (discussed later) and their Illinois statutory claims (also treated below). It thus becomes necessary to decide only whether Ron and Cameron, and not the other Albers, met the test of *Schiavone.*

No abstract or general limitations period applies to cases in the federal courts. When *Schiavone* uses the phrase "limitations period," it necessarily refers to the period that is applicable to a particular claim in a particular case. Here that means the Section 1983 limitations period—which really means the Illinois limitations period for personal injury, as modified by Illinois tolling law.[50] And of course the same tolling provisions apply to the state law statutory and common-law claims as well.

Under Illinois tolling law there is really no limitations period at all where Ron and Cameron are concerned, because they are under a permanent legal disability. And because *no* limitations period applies, it is meaningless to say that Ron and Cameron were required to provide notice to NHRI

---

**49.** Congress has amended Rule 15(c) effective December 1, 1991 to provide for a more liberal approach to relation back than was permitted by *Schiavone* (see Notes of Advisory Committee on Rules, Notes to 1991 Amendment to Rule 15(c), in *Federal Civil Judicial Procedure and Rules* 49 (rev. ed. 1991)). But because that amendment applies only prospectively, this case

is governed by the pre-amendment Rule and decisions construing it.

**50.** Much earlier in this opinion (in its section dealing with the P & A Defendants) the entire subject of limitations, including the tolling provisions, has been dealt with at length.

"within the limitations period" as *Schiavone* commands. Just as Ron and Cameron would have been free under Illinois tolling law to file this lawsuit now or at any time in the future, so they must be considered free to name additional or replacement defendants at any time.

That result follows not only from the black-letter tolling law but also from the policies that underlie it. Ron and Cameron are subject to no statute of limitations because they cannot possibly assert their own interests in litigation. They must wait for somebody else to do that, and their substantive rights should not be prejudiced by the delays of any surrogate acting for them (see, e.g., *Mazikoske*, 149 Ill.App.3d at 178, 102 Ill.Dec. at 737, 500 N.E.2d at 630). That policy applies to the amendment of a complaint just as to its original filing. In short, *Schiavone* never comes into the picture—the addition of NHRI as a defendant was timely as a matter of law.

## RESPONDEAT SUPERIOR

Next up are two substantive defenses to the Section 1983 claims. NHRI argues first that it is not a state actor, and in the alternative that it cannot be held liable on a respondeat superior theory. This opinion deals only with the latter argument, which proves dispositive.

■ This opinion has already touched briefly on respondeat superior notions in discussing NHI Defendants. To reiterate: Private corporations, like municipal corporations, may not be held liable for their employees' torts under Section 1983 absent proof that the employees were acting pursuant to the corporation's own policy or custom.[51] Albers must show "an 'impermissible policy' or 'constitutionally forbidden' rule or procedure of [NHRI] which was the 'moving force of the constitutional violation'" (*Iskander*, 690 F.2d at 128 (citation omitted)).

Albers have alleged only that NHRI "failed to establish" policies and proce-

dures that would have prevented the non-consensual admission and confinement of Ron and Cameron (¶ 90). That allegation is closely analogous to the "failure to train" theory that was severely limited in *City of Canton v. Harris*, 489 U.S. 378, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989). Barring some indication that such a failure to establish policies and procedures was part of an intentional scheme to deprive Village Inn admittees of their rights, or some indication that such a failure rose to the level of "deliberate indifference" (*id.* at 389, 109 S.Ct. at 1205), the failure is not actionable under Section 1983.

What Albers must have done to survive dismissal was to allege some affirmative policy or custom that might fairly be characterized as the cause of plaintiffs' injuries. Allegations of that kind are sorely lacking from the Complaint, as was the case in *Martin v. O'Grady*, 738 F.Supp. 1191, 1194 (N.D.Ill.1990) (citation omitted):

> While a plaintiff ... does not have to provide formal evidence or detailed factual allegations documenting official policy, he must do more than merely plead the facts surrounding his individual case. From the allegations contained in [the] complaint, this court cannot conclude that his claim involves anything more than an isolated occurrence.

■ Albers do claim that the admissions of Ron, Cameron and Tracy Zang constitute three incidents that together suggest a policy or custom. But *Martin*'s cautionary language must still apply where more than one plaintiff is involved, when the facts alleged offer no basis for any reasonable inference that plaintiffs' experiences indicate corporate policies that are the moving force of the violations. Common sense dictates that the three admissions on which Albers rely really constituted a single incident. All arose from the same neglect allegation, all were motivated by the efforts of the same protective worker and all occurred at the same time. One

---

**51.** There is no hint that the complained-of decision was that of NHRI's ultimate policymaker, as required for direct attribution to a non-individual entity. Without such a demonstration,

the "policy" or "custom" analysis of the text becomes essential to entity liability under Section 1983.

single judgment by Village Inn staff people—the decision to honor or not to honor Michael Richardson's request for placement—was the basis of the confinement. Plaintiffs cannot use their own individualized experiences as the sole proof of a policy or custom (*McAdams v. Salem Children's Home*, 701 F.Supp. 630, 636 (N.D.Ill. 1988)).

■ Moreover, even if the three admissions *were* treated as providing adequate evidence of some policy or custom at Village Inn, Albers' argument must still fail. For the Complaint offers no basis at all for attributing that practice or custom to NHRI as the parent entity, rather than to the individual managers of Village Inn. Again the Section 1983 requirement of direct rather than vicarious responsibility scotches Albers' contention.

Albers have thus failed to allege facts sufficient to establish Section 1983 liability for NHRI, which is dismissed as a defendant to those claims. That conclusion is unavoidable under our Court of Appeals' requirement for particularized rather than generalized allegations to support Section 1983 complaints such as the one involved here (see, e.g., *Strauss v. City of Chicago*, 760 F.2d 765 (7th Cir.1985)). This Court has commented shortly after *Strauss* was decided on the problems that its requirement of fact pleading imposes on Section 1983 plaintiffs, quite at odds with the notice pleading regime generally prescribed by the Rules (*Payne*, 610 F.Supp. at 607–09). Without discovery, plaintiffs like Albers cannot muster the facts (if facts there are) that would prove policy or custom. And under the *Strauss* approach they are often out of court on a Rule 12(b)(6) motion before discovery can begin.

But *Strauss* dictates the "policy and custom" to which this Court must adhere. This Court dismisses NHRI as a corporate defendant to the Section 1983 claims (a dismissal that is without prejudice to the reassertion of the federal claims against NHRI if Albers should unearth evidence to support such claims).

## PENDENT–PARTY JURISDICTION II: NHRI

■ Earlier this opinion concluded that under *Finley* a district judge may not exercise pendent-party jurisdiction in a Section 1983 case originally filed in federal court, but that Section 1441(c) permits the exercise of such jurisdiction over pendent *plaintiffs* in a Section 1983 case removed from state court. Now the obverse side of the coin must be examined: the question of pendent-*defendant* jurisdiction in a Section 1983 removal case. After the dismissal of their Section 1983 claims against NHRI, Albers have no remaining federal cause of action against that defendant. Two state-law causes of action remain: those asserting false imprisonment and violation of the Mental Health and Developmental Disabilities Code and (relatedly) of the Nursing Home Care Reform Act. Must or should this Court remand those causes of action to state court?

At the outset the first step of the *Huffman* analysis turns out to be quite straightforward. Those state-law claims are not frivolous, they arise out of the same nucleus of fact as the federal claims in the case and they are arguably the kinds of claims often sued upon together. In short, they form part of the same Article III case or controversy as the federal claims, and it is within this Court's constitutional power to adjudicate all the claims together.

Now for the statutory analysis. As already described, *Finley* seems to render the "context or posture" inquiry largely an idle exercise in this situation. It makes sense instead to go straight to the statute: Section 1441(c), which grants the district court plenary power either to decide or to remand the state-law claims in a removed case. Section 1441(c) makes no distinction between claims that are not independently removable because one of the parties is pendent and claims that are not independently removable for any other reason—the district court may hear them all if it chooses in its sound discretion to do so. Certainly there is no reason to read the statute as creating distinctions between

pendent plaintiffs and pendent defendants (indeed, historically pendent-party jurisdiction has almost always been used to add pendent defendants (*Thomas,* 740 F.2d at 487)).

This Court holds that under Section 1441(c) as construed under *Finley,* it has the discretion to exercise or not to exercise pendent-party jurisdiction over NHRI. Determination of the direction in which it should exercise that discretion demands a threshold examination of the state-law claims themselves.

As already indicated, Albers allege violations of the Mental Health and Developmental Disabilities Code (Ill.Rev.Stat. ch. 91½) (the "Code") and the Nursing Home Care Reform Act (*id.* ch. 111½, ¶¶ 4151–4153) (the "Act"). NHRI raises two grounds for dismissal of those claims.

First, it is argued, the Complaint does not cite to the statutes with enough specificity to put NHRI on notice as to what particular statutory violations are alleged. That objection is without merit, and even if meritorious could readily be cured. This opinion therefore turns to the more troublesome second objection.

On that score NHRI argues that Albers have no private right of action under the portions of the Code referred to in Complaint ¶ 142. Apparently there is only one case even remotely related to that issue: *Montague v. George J. London Memorial Hosp.,* 78 Ill.App.3d 298, 33 Ill.Dec. 565, 396 N.E.2d 1289 (1st Dist.1979), which dealt with an entirely different section of the Code.

Implications or nonimplications of private rights of action are a much-mooted area under Illinois law, just as under federal law. Last year the Illinois Supreme Court reiterated its traditional test on that subject (*Corgan v. Muehling,* 143 Ill.2d 296, 312–13, 158 Ill.Dec. 489, 496, 574 N.E.2d 602, 609 (1991)):

> Implication of a private right of action is appropriate only if: (1) plaintiff is a member of the class for whose benefit the Act was enacted; (2) it is consistent with the underlying purpose of the Act; (3) plaintiff's injury is one the Act was designed to prevent; and (4) it is necessary to provide an adequate remedy for violations of the Act.

No Illinois Supreme Court case has ever applied the test to any portion of the Code.

This case as asserted against NHRI under the Code thus seems a prime candidate for application of the principle voiced in a number of decisions by our Court of Appeals, typified by this statement from *Afram Export Corp. v. Metallurgiki Halyps, S.A.,* 772 F.2d 1358, 1370 (7th Cir.1985):

> A party who wants a court to adopt an innovative rule of state law should litigate in state rather than federal court (if it can; it cannot if the defendant removes the case to federal court). Federal judges are disinclined to make bold departures in areas of law that we have no responsibility for developing.

Accord, such cases as *Gust K. Newberg Construction Co. v. E.H. Crump & Co.,* 818 F.2d 1363, 1368 (7th Cir.1987).

Albers cannot be faulted in *Afram Export* terms: After all, they did call upon the state courts to adjudicate their rights, while it was defendants who then shifted the field of battle to federal territory. But now one defendant—NHRI—could remain on this federal territory only as a tagalong to other and different claims against other defendants, while its own liability vel non (at least in major part) is best suited to resolution in the original forum. Jurisprudential considerations plainly counsel the resolution of the statutory claim against NHRI under the Code in the state courts rather than here.

Under those circumstances it is certainly the better part of discretion to dispatch *all* surviving claims against NHRI back to the Circuit Court of Cook County, rather than requiring Ron and Cameron and NHRI to do simultaneous battle in two different courtrooms. Certainly there is nothing in the claim under the Act (which does grant a private cause of action) or in the common law claim (which appears to sound in false imprisonment, although NHRI claims that it is too vaguely pleaded) that should cause those claims to be retained for trial togeth-

er with the other surviving claims that have been brought by all Albers (not just by Ron and Cameron, who are the only plaintiffs now suing NHRI) against the defendants other than NHRI.

Accordingly this Court exercises the power conferred on it by Section 1441(c) by remanding all the state law claims against NHRI to the Circuit Court of Cook County. As permitted by this District Court's General Rule 30(b), it orders the Clerk of Court to mail the certified copy of the remand order forthwith.

## CONCLUSION

So much of the Complaint is now gone, and so much of what is left must now be understood in different ways, that its patchwork remnants serve no one's interests in their present form. This Court therefore dismisses the Complaint, with leave granted to the remaining Albers to file in this Court's chambers, on or before March 23, 1992, a new one that conforms to the new shape of the case.

It would really be foolish and not particularly productive to go back through this almost endless opinion in an effort to condense its many holdings into summary form. Wait for the movie, or at least the paperback reprint (and not merely in F.Supp.). To summarize the results, however, is relatively easy: This Court has (1) granted in part and denied in part the motions to dismiss of P & A, Michael Richardson and Naiditch; (2) dismissed Joshua and Amy Alber and NHI Defendants as parties to the case; and (3) dismissed all claims against NHRI except the claims of Ron and Cameron Alber for asserted violations of the two Illinois statutes and asserted false imprisonment, all of which are remanded to the Circuit Court of Cook County.[52]

52. See Appendix.

1. It should be made clear that the parties' counsel cannot be faulted for not having themselves provided such a logical structure, as contrasted with their deficiencies of the type referred to in the first two sentences of this paragraph in the text. Where as here there are several sets of defense counsel, each of them representing a

Finally this action is set for a status hearing at 8:45 a.m. on March 30, 1992 for appearance by counsel for the remaining parties. At that time the parties should be prepared to discuss the time for requiring defendants to plead to the Second Amended Complaint, as well as further proceedings in the case.

## APPENDIX

It is pretty much self-evident that the length of a judicial opinion usually bears a high degree of correlation (though not necessarily one-to-one) to the number and complexity of the issues involved. This opinion is no exception to that. What is less evident to consumers than to producers of judicial opinions is that all too frequently there is a far more than linear increase in the amount of work that is involved in generating opinions of greater complexity (and hence greater length) as against those of lesser complexity and length. Again this opinion is no exception to that.

Unfortunately the lawyers involved, whose responsibility it is to know (at least at the outset) their lawsuits and the issues involved better than the judges to whose calendars those lawsuits are assigned, do not always recognize even the key issues. Nor do they always provide the key authorities to deal with those issues. All of this is a prelude to acknowledging the splendid work of this Court's law clerk Jeremy Feigelson, Esq. in spotting both the issues *and* numerous authorities not tendered by the litigants, as well as in mastering the difficulties of producing a draft opinion with a logical structure.[1] Having said that, this Court must add the point that it always makes when it has this kind of occasion to pay tribute to the outstanding work of one of its uniformly outstanding law clerks: Every draft opinion submitted by a law

different defendant or defendants, they quite naturally (and properly) focus on the issues that relate to their own respective clients. Plaintiffs' counsel just as naturally (and properly) respond in kind to the individual submissions by defense counsel. It therefore falls to the court's lot to organize the total treatment in a coherent whole.

clerk is reviewed and reworked sentence by sentence (indeed, word by word) by this Court, and as part of that process this Court also reads every one of the authorities that is cited in each of its opinions. If then there is anything to find fault with in this or any other completed opinion, that fault is ascribable to this Court and not to the fine work of its clerks.